Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us. Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE

June 10, 2019

**2019 CO 51**

**No. 18SC30,** *Carousel Farms v. Woodcrest Homes*—Takings—Public Purpose—Economic Development

The supreme court considers the appropriate standard of review for condemnation cases and whether a condemnation by a special metropolitan district that satisfies private, contractual obligations while also providing benefits to the public violates the Colorado Constitution and relevant statutes.

The supreme court holds that takings questions present mixed issues of law and fact, with public use being a question of law that is reviewed de novo. As a result, the supreme court reviews de novo the taking in question.

The supreme court further holds that takings that essentially benefit the public will survive constitutional scrutiny, even if, at the time of the taking, there is an incidental private benefit. Therefore, the taking here is valid, as the condemned land will be used for various utilities and public rights of way.

The supreme court concludes by holding that the plain language of section 38-1-101(1)(b)(I), C.R.S. (2018) only limits the transfer of condemned land to a private entity. Because there is no transfer to a private entity here, that section is inapplicable.

## The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

**2019 CO 51**

**Supreme Court Case No. 18SC30**
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 15CA1956

**Petitioner:**

Carousel Farms Metropolitan District, a quasi-municipal corporation and political subdivision of the State of Colorado

v.

**Respondent:**

Woodcrest Homes, Inc., a Colorado corporation.

**Judgment Reversed**
*en banc*
June 10, 2019

**Attorneys for Petitioner:**
Alderman Bernstein LLC
Jody Harper Alderman
Carrie S. Bernstein
Amanda E. Bradley
Steven M. Nagy
        *Denver, Colorado*

**Attorneys for Respondent:**
Dymond Reagor, PLLC
David D. Schlachter
        *Greenwood Village, Colorado*

**Attorneys for Amicus Curiae Institute for Justice:**
Diana Simpson
Jeffrey Redfern
  *Arlington, Virginia*

**JUSTICE HOOD** delivered the Opinion of the Court.

¶1 A subdivision development contemplated by Woodcrest Homes seems to have been yet another casualty of the 2007-2008 financial crisis. Before the economic downturn, Woodcrest was poised to construct the new development adjacent to the town of Parker. But with the economy in dire straits, Woodcrest secured only a small parcel—known as Parcel C—stuck between two larger parcels that were necessary for completion of the project. Now, over a decade after the failed development, a special metropolitan district controlled by a competitor, Century Communities, seeks to condemn Parcel C and finish what Woodcrest started.

¶2 But Woodcrest objects. It claims that the entire condemnation proceeding is really a sham designed to benefit Century. Woodcrest maintains that the condemnation violates both the public use protections of the Colorado Constitution and the statutory prohibition on economic development takings. According to Woodcrest, the purpose of the taking, at the time it occurred, was to satisfy contractual obligations between Century and Parker. Because the public would not be the beneficiary *at the time of the taking*, Woodcrest contends that this condemnation violates the Colorado Constitution. Moreover, it argues, the taking effectively transfers the condemned land to Century, which violates section 38-1-101(1)(b)(I), C.R.S. (2018), the state's anti-economic development takings statute.

¶3 We disagree. The centerpiece of our jurisprudence on takings and public use is that the taking must, at its core, benefit the public. The condemnation of Parcel C will do just that, with the intended construction of various utilities, public rights of way, and sidewalks. There is nothing in the Colorado Constitution that prohibits private parties

4

from incidentally benefiting from any particular condemnation. Additionally, Colorado's prohibition on economic development takings has no bearing on the condemnation at issue here: The plain language of section 38-1-101(1)(b)(I) prevents public entities from transferring condemned land to private entities. But there was no transfer, and the only entity involved was a public one, the special district.

¶4 Before reaching any of those issues, however, the parties ask us to clarify whether clear error or de novo review applies to a trial court's public use determination. Because public use is ultimately a legal question, we review it de novo, while deferring to the trial court on underlying historical facts.

¶5 Therefore, we hold as follows. First, takings questions present mixed issues of law and fact, with public use being a question of law that is reviewed de novo. Second, takings that essentially benefit the public will survive constitutional scrutiny, even if, at the time of the taking, there is an incidental private benefit. As a result, the taking here is valid. Third, the plain language of section 38-1-101(1)(b) only limits the transfer of condemned land to a private entity and, because there was no transfer and no private entity involved here, that section is inapplicable.

## I. Facts and Procedural History

¶6 In 2006, the respondent, Woodcrest Homes, began the process of securing three parcels to build a new development that would be annexed into the town of Parker. Woodcrest purchased Parcel C, a small parcel around twenty feet wide that totaled about 0.65 acres, sandwiched between two approximately twenty-acre parcels known as Parcels A and B. This sliver of land offered Woodcrest an opportunity to plan utilities

5

for its development, as Parcel C already contained a sewer line, a water line easement, and a natural drainage system with culverts. Although Woodcrest was under contract to purchase Parcels A and B, the "weak housing market" left Woodcrest unable to move ahead.

¶7 Fast forward to 2012, when Century acquired Parcels A and B. In 2013, Century offered to purchase Parcel C from Woodcrest, tendering nearly $45,000. Woodcrest rebuffed the offer, remarking that it subsidized, at great cost, Century's ability to complete the development, given that Century intended to use Woodcrest's plans for the development. Undeterred, Century told Woodcrest that it would continue to pursue development and that, if Woodcrest didn't accept some offer, Century would condemn Parcel C with the "Town Council's support."[1] Then, using nearly identical plans to Woodcrest's—which included using an already encumbered Parcel C for sewage, roads, and other public improvements—Century approached Parker. Century asked for the same deal that Woodcrest had in 2006, and Parker agreed that it would annex the development and approve the development's plat, if Century owned all three parcels.

¶8 Century then created a metropolitan district called Carousel Farms (the District). This quasi-municipal structure empowered the District to raise revenue through municipal bonds and, more importantly, condemn property through eminent domain.

---

[1] As it turns out, Parker doesn't typically exercise its eminent domain power and had little intention of using it here.

6

The District was run solely by Century employees and officers. The District made a final offer to Woodcrest, which Woodcrest rejected. Then, the District sought to condemn Parcel C. But, before it could do so, the District needed to amend the agreement with Parker so that it was the District's possession of Parcel C, not Century's, that was the prerequisite for plat approval and annexation. Parker obliged, and the District initiated condemnation proceedings.

¶9 At the immediate possession hearing in district court, Woodcrest argued that the District was acting as a puppet for Century. To Woodcrest, the District was a mere façade designed to empower Century to acquire Parcel C and complete the development, making the taking not for a public use but for a private one. The district court disagreed, holding that the taking was indeed for public use. The court subsequently adopted the District's proposed findings of fact and conclusions of law, verbatim or almost verbatim.

¶10 A division of the court of appeals disagreed and reversed. First, it concluded that, in condemnation proceedings, the district court's findings of fact were reviewed for clear error and its legal conclusions reviewed de novo. *Carousel Farms Metro. Dist. v. Woodcrest Homes, Inc.*, 2017 COA 149, ¶ 32, __ P.3d __. However, it reasoned that the district court's findings were subject to heightened scrutiny because the district court

7

adopted the prevailing party's proposed findings of fact and conclusions of law verbatim.[2] *Id.*

¶11 Second, the division held that the taking was not for public use, as the taking "itself" was to satisfy the District's contractual obligations, which were, under any metric, not a public use. *Id.* at ¶¶ 36–38. The eventual dedication for utilities and roads was a "step removed" and couldn't save the taking from infirmity. *Id.* at ¶ 37.

¶12 Third, the division concluded that the taking was not necessary to accomplish a public use, as there was no public use even in play. *Id.* at ¶ 41. Moreover, the division reasoned that, because the District was composed of Century employees only, formed after Century couldn't privately acquire Parcel C, and only initiated to meet contractual obligations, the taking was done in bad faith. *Id.* at ¶¶ 43–44.

¶13 Finally, the division held that the taking also violated section 38-1-101(1)(b)(I), which prohibits takings that transfer property to private entities for the purpose of economic development. *Id.* at ¶ 48. To the division, the taking effectively transferred the land to the developer, violating the spirit of section 38-1-101(1)(b)(I) and the rule that the "law may not be used to permit one to accomplish indirectly what he may not achieve directly." *Id.* at ¶ 52 (quoting *Salle v. Howe*, 793 P.2d 628, 631 (Colo. App. 1990)).

---

[2] It's unclear whether the trial court adopted the proposed findings of fact and conclusions of law verbatim or nearly verbatim, and the parties disagree on this fact. But this disagreement ultimately doesn't matter, as there is no more heightened scrutiny than de novo review, which we hold is the appropriate standard of review for public use determinations.

¶14     The District petitioned this court for review and we granted certiorari.[3]

## II.  Analysis

¶15     We begin by addressing the appropriate standard for appellate review of takings questions.  While Colorado caselaw has been somewhat muddled on this subject, we conclude that takings questions present mixed issues of law and fact.  We therefore defer to a trial court's factual determinations, but we review de novo the legal determination of whether something is for a public use.  Next, we analyze the District's taking and determine that, because the taking was essentially for public benefit, it meets the public use requirements of the state constitution and the relevant statutes.  Finally, we examine section 38-1-101(1)(b)(I).  Because (1) the plain language of the statute only

---

[3] We granted certiorari to review the following issues:

1. [REFRAMED] Whether the court of appeals should review for clear error a trial court's determination that a condemning authority sufficiently demonstrated that a taking is for public use.

2. [REFRAMED] Whether the court of appeals erred in concluding a metropolitan district failed to prove condemnation of a parcel was for public use and necessary, where the subdivision that would principally benefit from the condemnation did not exist at the time of the taking and development of the subdivision was conditioned on the district's acquisition of the parcel.

3. [REFRAMED] Whether the court of appeals erred in concluding that a metropolitan district's condemnation of a parcel violated section 38-1-101(1)(b), C.R.S. (2017), when the condemned parcel would be dedicated to the public and would not be transferred to a private entity.

9

covers transfers from public entities to private entities and (2) the District is a public entity that never initiated any sort of transfer, this statutory provision doesn't apply.

## A. Public Use and the Standard of Review

¶16    Our takings cases have sown confusion as to the appropriate standard to review a trial court's public use determination.  Sometimes, we have intimated that the standard is clear error—essentially holding that public use is a fact question left to the trial court.  *See, e.g.*, *City & Cty. of Denver v. Block 173 Assocs.*, 814 P.2d 824, 828–29 (Colo. 1991) ("In examining the stated public purpose for a condemnation, we look to whether the stated public purpose is supported by the record.  If so, our inquiry ends."); *Pub. Serv. Co. of Colo. v. Shaklee*, 784 P.2d 314, 318 (Colo. 1989) ("[A]lthough conflicting evidence was presented at trial, the evidence supports the trial court's conclusion that the condemnation was for a public use . . . .").  Other times, we have stated that the inquiry involves a mixed question of law and fact.  *See, e.g.*, *Glenelk Ass'n, Inc. v. Lewis*, 260 P.3d 1117, 1120 (Colo. 2011) (citing *Fowler Irrevocable Tr. 1992-1 v. City of Boulder*, 17 P.3d 797, 802 (Colo. 2001)) (stating that the court of appeals defers to findings of fact "unless they are . . . clearly erroneous" but "review[s] legal conclusions de novo"); *Fowler*, 17 P.3d at 802 (citing *E-470 Pub. Highway Auth. v. The 455 Co.*, 3 P.3d 18, 22 (Colo. 2000)) ("We defer to the trial court's findings of fact and conduct de novo review of its legal conclusions.").[4]

---

[4] While *Glenelk* and *Fowler* are not prototypical eminent domain cases—they are private condemnation and inverse condemnation cases, respectively—the standards and rules

¶17    We conclude that takings present mixed questions of law and fact, with public use determinations reviewed de novo.

¶18    As a general proposition, findings of fact should be reviewed for clear error, and legal conclusions should be reviewed de novo. *See E-470*, 3 P.3d at 22 (citing *Valdez v. People*, 966 P.2d 587, 598 (Colo. 1998) (Kourlis, J., dissenting)). The judicial system takes this approach for at least two reasons. First, judicial economy—trial courts make factual findings and appellate courts "pronounc[e]" law. *See* J. Jonas Anderson, *Specialized Standards of Review*, 18 Stan. Tech. L. Rev. 151, 159–60 (2014). Without this division, district courts would need to reexamine the law in each case, rendering their already time-consuming trial work completely unmanageable. *Id.* at 160. And if appellate courts were forced to take a fine-toothed comb to the factual disputes in each case, the appellate docket would likewise suffer a major backlog. *Id.* But because district courts are required to follow appellate precedent and appellate tribunals review legal conclusions de novo, this bifurcation of duties enables appellate tribunals to more efficiently create legal uniformity.

¶19    Second, institutional competence. For example, appellate tribunals don't (and, indeed, can't) make findings of fact. *See Valdez*, 966 P.2d at 598 (Kourlis, J., dissenting).

---

for both types of cases are the same as eminent domain cases like the one before us, other than a few particularities not relevant here. *See Glenelk*, 260 P.3d at 1120–21; *Fowler*, 17 P.3d at 802. In any event, de novo review of public use determinations is the most appropriate standard of review, as we explain below.

11

Without the ability to make factual findings, it's unclear how an appellate court could review factual determinations "anew." *See De novo*, Black's Law Dictionary (10th ed. 2014) (defining the Latin term "de novo" as "anew"). And, because appellate courts don't make findings of fact, trial judges are the only ones who have the "unparalleled opportunity to determine the credibility of the witnesses and the weight to be afforded the evidence." *See M.D.C./Wood, Inc. v. Mortimer*, 866 P.2d 1380, 1384 (Colo. 1994) (quoting *Page v. Clark*, 592 P.2d 792, 796 (Colo. 1979)). The trial judge is essential in sorting the factual wheat from the chaff.

¶20    What does this mean for condemnation proceedings? For starters, when it comes to appellate review of public use determinations, the chaff has already been discarded. The facts have been "found" and the record set by the trial court. And while the debate over the standard of review here demonstrates that the distinction between law and fact isn't always a bright one, fact questions "usually call[] for proof" and legal questions "usually call[] for argument." Clarence Morris, *Law and Fact*, 55 Harv. L. Rev. 1303, 1304 (1942). Whether the District condemned Parcel C asks for proof—the trial court needs some sort of evidence that Woodcrest isn't still in possession and control of the parcel. And the District's alleged use of Parcel C as drainage and roads—not to build, say, a home for the CEO of Century—also demands proof. The trial judge's presence is key for sorting through such issues. *Cf. Mortimer*, 866 P.2d at 1384. These are the "fact" questions that takings cases present. But whether the uses are public tends toward legal pronouncement, *cf.* Anderson, *supra* at 159–60, and "calls for argument," *cf.* Morris, *supra* at 1304—in other words, the "legal" part of takings' mixed review. Moreover,

12

having an appellate tribunal look to and set standards around the varied circumstances in which takings arise helps generate the uniformity and workload reduction for which the bifurcated role between trial and appellate courts was, in part, created. *Cf.* Anderson, *supra* at 159–60.

¶21    The Supreme Court has also stated that cases that "require courts to expound on the law" are best suited toward de novo review. *See U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Village at Lakeridge, LLC*, 138 S. Ct. 960, 967 (2018). More concretely, de novo review is appropriate "when applying the law involves developing auxiliary legal principles of use in other cases." *Id.* There is "[n]o precise line" for public use determinations. *See Tanner v. Treasury Tunnel, Mining & Reduction Co.*, 83 P. 464, 465 (Colo. 1906). Thus, when analyzing whether something is a public use, there must be a "degree of elasticity capable of meeting new conditions and improvements, and the ever-increasing needs of society." *Id.* So, because there isn't a strict, immutable test through time, courts are tasked with doing just what the Supreme Court suggests that courts do with de novo review—expound on the law so as to create a set of principles for use in other cases. In other words, public use determinations fit neatly into the framework and principles behind de novo review.

¶22 Therefore, takings cases present mixed issues of law and fact, and a trial court's public use determination should be reviewed de novo. Any cases from this court or the court of appeals holding otherwise are overruled.[5]

## B. The Taking Essentially Created a Public Benefit

¶23 We now analyze whether the taking satisfied the public use requirement of our state constitution and statutes. Because the taking's purpose was essentially to benefit the public, we reverse the division's judgment.

¶24 The Colorado Constitution requires that, when the government takes private land, it must pay just compensation and the land must be put to a public use. *See* Colo. Const. art. II, § 15. The General Assembly has confirmed the importance of this prohibition by further enacting these requirements into statutory law. *See* § 38-1-101(1)(a), C.R.S. (2018) ("Notwithstanding any other provision of law, in order to protect property rights, without the consent of the owner of the property, private property shall not be taken or damaged by the state or any political subdivision for a public or private use without just compensation."). Additionally, even if a taking is

---

[5] It's unclear whether the division below applied a de novo or clear error standard to its review. It implies that the standard of review is de novo when it cites to *Glenelk*. *Carousel Farms*, ¶ 32 (citing *Glenelk*, 260 P.3d at 1120). But it then reasons that, because the trial court adopted the prevailing party's proposed findings of facts and conclusions of law verbatim, the findings are subject to heightened scrutiny. *Id.* Heightened scrutiny would be irrelevant if the division was applying de novo review, as there exists a no less deferential standard, therefore suggesting that the division was applying clear error with heightened scrutiny. To the extent that the division applied clear error, we disagree.

14

found to satisfy the public use requirement, the land taken must also be necessary to the intended public use. *See Mortensen v. Mortensen*, 309 P.2d 197, 199 (Colo. 1957).

¶25    The term "public use" is inherently amorphous.  As noted above, we long ago observed that there is "no precise line" and the meaning of public use is flexible, having a "degree of elasticity capable of meeting new conditions and improvements, and the ever-increasing needs of society."  *Tanner*, 83 P. at 465.  To help guide courts, we have set out factors to consider, but these are by no means exhaustive or exclusive.  *See Shaklee*, 784 P.2d at 318 (quoting *Larson v. Chase Pipe Line Co.*, 514 P.2d 1316, 1318 (Colo. 1973)).  Those factors are: "[T]he physicial [sic] conditions of the country, the needs of a community, the character of the benefit which a projected improvement may confer upon a locality, and the necessities for such improvement in the development of the resources of a state."  *Tanner*, 83 P. at 465; *accord Shaklee*, 784 P.2d at 318 (quoting *Larson*, 514 P.2d at 1318).

¶26    These guidelines, however, only assist a court in assessing whether the taking is "essentially for public benefit."  *Tanner*, 83 P. at 465.[6]  It's quite possible that the four *Tanner* factors point in different directions, rendering them unhelpful in the final analysis.  But so long as the taking is "essentially for public benefit," it can withstand

---

[6] Colorado doesn't adhere to a strict definition of public "use."  *See, e.g.*, *Rabinoff v. Dist. Court*, 360 P.2d 114, 119–121 (Colo. 1961) (reasoning that the public use requirement of the Colorado Constitution contemplates takings for a public purpose and not only use by the public).  Thus, public use, as used in the state constitution, more accurately reflects a demand that takings serve a public purpose or benefit, as *Tanner* and others have articulated.  *Id.*; *see also Tanner*, 83 P. at 465.

constitutional scrutiny. *Id.* This means that the fundamental and intrinsic nature of the taking must be for public benefit. *See Essential*, Webster's New College Dictionary (2005) (defining "essential" as "of or constituting the intrinsic, fundamental nature of something"). Of course, private parties may benefit, perhaps significantly. *See Shaklee*, 784 P.2d at 318–19 (holding that a public utility could condemn property so that it could service the Coors Brewery because the public could eventually use the new power line). But if the purpose and benefit are essentially public, then the taking offends neither the state constitution nor section 38-1-101(1)(a).[7]

¶27    Here, the taking is essentially for public benefit. Parcel C will be used for public right of ways, storm drainage, and sewer improvements. It is difficult to argue that those functions don't essentially benefit the public. It is true that Century will also benefit from the taking, but, as we already explained, that doesn't somehow change the essential benefit from public to private. If a utility company can condemn a large strip of land to supply power to a private, for-profit corporation because residents might use

---

[7] Permitting some private benefit by public taking may strike some as unusual. But Colorado is no stranger to this method of encouraging development. Our constitution and statutes contemplate wholly private takings for numerous non-public projects, like drains, mining, and milling. *See* Colo. Const. art. II, § 14; § 38-1-201, C.R.S. (2018) ("[T]he power of eminent domain allows . . . individual property owners and corporations to condemn property . . . when condemnation is necessary . . . to allow beneficial use of private property."); § 38-2-104, C.R.S. (2018) (enabling "the owner of any coal or other mineral lands, not contiguous to any railroad in this state" to "exercise the right of eminent domain and condemn [property]" for the purpose of connecting mineral lands to a railroad).

the power line in the future, then the District may condemn Parcel C for planned improvements that will benefit the community. *See Shaklee*, 784 P.2d at 318–19.

¶28 Significantly, Parcel C was always going to be used for those improvements—even under Woodcrest's original plan—because Parcel C is encumbered by easements and utilities and is best suited for those purposes. While review of potentially improper takings can often be problematic because courts don't know ex ante whether the land will be used as claimed, here we know from the start how the District will utilize Parcel C. *See* Ilya Somin, *Overcoming Poletown*, 2004 Mich. St. L. Rev. 1005, 1015 ("In the absence of any binding obligations to deliver on the promised economic benefits, nothing prevents municipalities and private interests from . . . failing to provide any such benefit[] once courts approve the taking . . . .").

¶29 The division reasoned that the eventual dedication of the land to a public purpose is insufficient because the "taking itself" wasn't for a public purpose. *Carousel Farms*, ¶ 35. That is, the *first* benefit to be received (even if a minor one) is satisfying the contractual obligations between the District and Parker, which isn't a public benefit in any sense. *Id.* at ¶¶ 35–37. Thus, the argument goes, because that first benefit itself isn't public, the entire taking doesn't pass constitutional muster. *Id.*

¶30 This analysis fails for two reasons. First, the test is, and has been since 1906, whether the taking is "essentially for public benefit." *See Tanner*, 83 P. at 465; *accord Buck v. Dist. Court*, 608 P.2d 350, 351 (Colo. 1980). A taking may have some sort of antecedent benefit that isn't public, so long as the essential benefit is ultimately public. Presumably, developers and towns frequently enter into agreements before land is

17

condemned. How else would towns garner the political support to complete parks or other public works projects? The town likely would need to hire a developer and sign a contract before it exercised its eminent domain power and spent taxpayers' dollars on the condemnation. But the division's reasoning would have all agreements of this sort fail, because the *first* benefit or purpose is to satisfy that contractual obligation, even though the essential benefit is ultimately building parks or other public works for the town.[8]

¶31 Second, it relies on flawed precedent on takings and public benefit. The division cites another division's opinion in *American Family Mutual* for the proposition that the taking itself must be for a public purpose, and, in turn, *American Family Mutual* cites *Trinity Broadcasting* for the same notion. *See Carousel Farms*, ¶ 35 (citing *Am. Family Mut. Ins. Co. v. Am. Nat'l Prop. and Cas. Co.*, 2015 COA 135, ¶ 30, 370 P.3d 319, 327); *American Family Mutual*, ¶ 30, 370 P.3d at 327 (citing *Trinity Broad. of Denver, Inc. v. City of Westminster*, 848 P.2d 916, 921 (Colo. 1993)). But *Trinity Broadcasting* made no such declaration.

¶32 In *Trinity Broadcasting*, we held that water damage that occurred because of accidental leaking from town-owned water towers wasn't a taking. 848 P.2d at 921. However, we weren't discussing public use at all. The issue was whether the leakage

---

[8] This, of course, isn't to say that there's no time limitation whatsoever. It's unlikely that a taking where the public doesn't benefit for a significant amount of time would essentially benefit the public. But, an incidental private benefit that results from fulfilling antecedent contractual obligations doesn't implicate this longer time scale.

itself counted as an *act* of eminent domain, not whether the leakage was for public use. *Id.* at 921–22. And while leakage in another case could count as a taking, the leakage in *Trinity Broadcasting* didn't because the government lacked "the intent to take the property or to do an act which has the natural consequence of taking the property." *Id. Trinity Broadcasting* thus has no effect on this case. No one questions that the condemnation of Parcel C was an act of eminent domain. The only issue is whether that act was essentially for the public benefit, which we conclude it was.

¶33 That still leaves us with the question of whether the taking was necessary for the intended public use. *See Mortensen*, 309 P.2d at 199 (quoting *Rothwell v. Coffin*, 220 P.2d 1063, 1065 (Colo. 1950)) ("The question of necessity simply involves the necessity of having the property sought to be taken for the purpose intended."). Absent fraud or bad faith, the condemning authority's necessity determination "is final and conclusive and will not be disturbed by the courts." *Colo. State Bd. of Land Comm'rs v. Dist. Court*, 430 P.2d 617, 619 (Colo. 1967). In the District's case, the taking was necessary for the purpose intended because the District needs Parcel C to assemble the land and build the sewage, drains, and so on that the development calls for. That should be the end of the analysis, as the necessity determination is meant to be "final and conclusive," unless there is fraud or bad faith. *See id.*

¶34 The division, however, held that the District acted in bad faith because it was run by Century employees, who condemned the property to meet the District's contractual obligations, and only did so once negotiations with Woodcrest failed. *Carousel Farms*, ¶¶ 43–44. But Century and the District always sought to build public improvements

19

and have the development annexed into Parker, and we already rejected the notion that the District and Parker's desire to fulfill their contractual obligations predominated over the essential public purpose of the taking. Moreover, developer employees frequently comprise the sole managers of special districts in their early stages.[9] Therefore, neither of these two facts sufficiently demonstrates the District's bad faith.

¶35 The division's fundamental concern seems to be with the order of the condemnation: The District was only formed after Century failed in negotiations with Woodcrest. True, but there isn't an order-of-formation or order-of-negotiation requirement in the Colorado Constitution or the special district statutes. Holding that there is would involve inserting such a requirement into the statute. And that is not for us to do. *See State v. Medved*, 2019 CO 1, ¶ 19, 433 P.3d 33, 37 (quoting *People v. Diaz*, 2015 CO 28, ¶ 15, 347 P.3d 621, 625) ("In interpreting a statute, we must accept the General Assembly's choice of language and not add or imply words that simply are not there.").

---

[9] The process of developer-initiated special district formation is by no means peculiar to the District here or Colorado as a state. The Colorado Department of Local Affairs informs as follows: "Metropolitan districts, since they can offer multiple services, are often established by developers to finance, through the issuance of municipal bonds, the infrastructure necessary to support a new subdivision." Special District Assistance, *Special Districts: A Brief Review for Prospective Homeowners* 3 (Colo. Dep't Loc. Aff.), https://drive.google.com/file/d/0B0m67XbcqVYRbVJYVGFmLURqeU0/view [https://perma.cc/VGT3-N6DW]. And across the United States, special districts spend nearly $175 billion and have almost $300 billion in debt. Nadav Shoked, *Quasi-Cities*, 93 B.U. L. Rev. 1971, 1977 (2013). Nationally, there are almost as many special districts as there are counties, cities, and towns combined. *Id.*

¶36    Moreover, eminent domain was partly designed to overcome the "holdout" problem that occurred here. *See* Thomas W. Merrill, *The Economics of Public Use*, 72 Cornell L. Rev. 61, 74–75 (1986) ("Without an exercise of eminent domain, . . . owner[s] would have the power to hold out . . . . If even a few owners held out, others might do the same."). The District exercised the power of eminent domain to prevent a holdout owner from thwarting the assembly of adjacent properties that would benefit the public.

¶37    The division's and Woodcrest's reliance on *Geudner* is also unavailing. *Carousel Farms*, ¶ 45. There, one family operated a special district, and all the land within the district was owned by the family or corporations controlled by the family. *Denver W. Metro. Dist. v. Geudner*, 786 P.2d 434, 435 (Colo. App. 1989). One of the family-owned corporations, Denver West Properties (DWP), contracted to sell a parcel of land within the district. *Id.* As a condition of the sale, the purchaser wanted a gulch on the property moved. *Id.* An engineering firm developed three proposals for flood mitigation of the ditch, but the most "hydrologically sound" option required keeping the gulch on the sale property, which DWP didn't like. *Id.* So, DWP directed the engineering firm to develop a mitigation plan that would relocate the gulch off the sale property. *Id.* at 435–36. The proposal moved the gulch to Geudner's land. *Id.* at 436. When Geudner wouldn't sell the portion of the land to which the gulch would be moved, the district then sought to the condemn property in order to complete the sale. *Id.* at 435–36. The difference between the taking in *Geudner* and the District's taking is clear: In *Geudner*, there was never an initial intention to benefit the public—the justification of flood

21

mitigation was added once the purchaser wanted the gulch moved. *See id.* And, even then, the most "hydrologically sound" mitigation plan wasn't the chosen one, because that plan required the gulch to remain on the property in question. *Id.* Here, the trial court found, with ample record support, that Century (and then the District) always planned on putting public improvements on Parcel C; there wasn't a post-hoc public-use justification.

¶38 In sum, so long as the essential benefit of a taking is public, the taking passes constitutional muster. That was the case here.

## C. Private Entities, Transfers, and Takings

¶39 After briefly addressing the standard of review, we proceed to interpret section 38-1-101(1)(b)(I). We conclude that the statute doesn't apply to the taking here, as there wasn't a transfer from a public entity to a private one.

## 1. Standard of Review and Principles of Interpretation

¶40 Issues of statutory construction, like the issue before us, are questions of law that we review de novo. *See Doubleday v. People*, 2016 CO 3, ¶ 19, 364 P.3d 193, 196. The primary purpose is to give effect to the intent of the legislature. *Id.* Words and phrases are to be given their plain and ordinary meanings, read in context, and construed according to the rules of grammar and common usage. *Id.* A statute is to be read as a whole, giving consistent and sensible effect to all its parts. *Id.* at ¶ 20, 364 P.3d at 196.

## 2. No Transfer, No Private Entity

¶41 Section 38-1-101(1)(b)(I) unambiguously applies only to transfers of property to private entities. The section states, in part: "For purposes of satisfying the requirements

22

of this section, 'public use' shall not include the taking of private property for *transfer* to a *private* entity for the purpose of economic development or enhancement of tax revenue." § 38-1-101(1)(b)(I) (emphases added).

¶42     First, this section only covers "transfer[s]." *Id.* Without a transfer, it doesn't spring into action. Webster's defines a "transfer" of property as "to make over or convey (property, title to property etc.) to another." *Transfer*, Webster's New College Dictionary (Michael Agnes, ed., 2004). And Black's defines a "transfer" of property as "a conveyance of property or title from one person to another." *Transfer*, Black's Law Dictionary (10th ed. 2014). Thus, under no circumstance can the word "transfer" apply to a situation in which someone keeps property. In our case, that means that the condemning authority—here, the District—needs to actually convey the condemned property to someone else. But that never happened. The District condemned Parcel C and then kept it. Consequently, the statute doesn't apply.

¶43     But let's assume it somehow did. The property still needs to be conveyed to a private entity. *See* § 38-1-101(1)(b)(I) ("'[P]ublic use' shall not include the taking of private property for transfer to a *private* entity . . . . (emphasis added)). The only entity involved, however, was a public one—the metropolitan district. Metropolitan districts are special districts that offer many of the same services as towns, such as safety, transportation, street improvement, and fire protection. *See* § 32-1-103(10), C.R.S. (2018). And, of course, they also have the power of eminent domain. *See* § 32-1-1004(4), C.R.S. (2018). Therefore, the District functions as a public entity, not a private one. *See Public entity*, Black's Law Dictionary (10th ed. 2014) (defining "public entity" as a

23

"governmental entity, such as a state government or one of its political subdivisions"). So, even if there somehow was a transfer, it wouldn't have been to a private entity. In other words, the statute wasn't designed to limit a public entity from taking a property and keeping it.

### 3. *Kelo* Doesn't Dictate a Different Result

¶44 Both the division below and Woodcrest argue that allowing the District to do what it did here would be to permit Century to accomplish indirectly what it couldn't do directly. For them, *Kelo v. City New London* and Colorado's anti-*Kelo* statute prevent the District from finishing the developer's project. *See* § 38-1-101(1)(b)(I); *Kelo v. City of New London*, 545 U.S. 469 (2005). However, *Kelo* and section 38-1-101(1)(b)(I) don't affect the outcome.

¶45 First, as we just explained, the anti-*Kelo* statute, section 38-1-101(1)(b)(I), doesn't apply when a public entity takes a property and keeps it for itself. The division implies that, through a "manipulation of circumstances," Century violated the spirit of Colorado's anti-*Kelo* statute. *Carousel Farms*, ¶ 52. But, the spirit of a statute doesn't displace its plain language. *Cf. Doubleday*, ¶ 19, 364 P.3d at 196 ("We look first to the language of the statute, giving words and phrases their plain and ordinary meanings."). If the legislature wanted to forbid districts from doing what the District did here, then it could have built safeguards into the metropolitan district statute or the takings statute. And, if districts couldn't work with developers, it's unclear why all districts would have the power to "enter into contracts and agreements affecting the affairs of the special district." *See* § 32-1-1001(1)(d)(I), C.R.S. (2018).

24

¶46　Second, *Kelo* doesn't change any of this. In *Kelo*, the city of New London sought to condemn a wide swath of land and transfer it to a private company for economic development. 545 U.S. at 473–75. The Supreme Court said that such a taking didn't violate the Fifth Amendment, but left room for the states to enact more stringent regulations. *Id.* at 489–90. In Colorado, that more stringent regulation is section 38-1-101(1)(b)(I). Still, the fact that Colorado took the Supreme Court's advice and enacted a tougher regulation doesn't change the plain language of that regulation.

¶47　The plain language of section 38-1-101(1)(b)(I) only limits the transfer of condemned land to a private entity. Because there was no transfer and no private entity involved here, that section is inapplicable.

## III. Conclusion

¶48　The Colorado Constitution requires that condemnation benefit the public, but it doesn't prohibit a private party from also benefiting. When a condemnation's benefits are essentially public, as they are here, there is no constitutional violation. We reach this conclusion through de novo review because, regardless of our previous inconsistencies, public use determinations are best suited toward such review. And although Colorado has a prohibition on economic development takings, that prohibition isn't implicated here because the only entity involved is a public one, which kept the condemned property for itself.

¶49　We therefore hold as follows. First, takings questions present mixed issues of law and fact, with public use being a question of law that is reviewed de novo. Second, takings that essentially benefit the public will survive constitutional scrutiny, even if, at

25

the time of the taking, there is an incidental private benefit. As a result, the taking here is valid. Third, the plain language of section 38-1-101(1)(b) only limits the transfer of condemned land to a private entity and, because there was no transfer and no private entity involved here, that section is inapplicable.

¶50 Accordingly, we reverse the division's judgment and remand for further proceedings consistent with this opinion.