24CA1402 Peo in Interest of IH 03-20-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 24CA1402
Adams County District Court No. 22JV30048
Honorable Caryn A. Datz, Judge

The People of the State of Colorado,

Appellee,

In the Interest of I.H. and I.H., Children,

and Concerning C.H. and K.A.,

Appellants.

_____

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE GOMEZ
Fox and Lum, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced March 20, 2025

_____

Heidi Miller, County Attorney, Megan Curtiss, Assistant County Attorney, Westminster, Colorado, for Appellee

Josi McCauley, Guardian Ad Litem

Just Law Group, LLC, John F. Poor, Denver, Colorado, for Appellant C.H.

Lindsey Parlin, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant K.A.

¶ 1     C.H. (mother) and K.A. (father) appeal the juvenile court's judgment terminating their parent-child legal relationships with I.H. and I.H. (the children).  We affirm.

## I.     Background

¶ 2     The Adams County Department of Human Services filed a petition in dependency and neglect after it investigated reports that the then four-month-old-twin children had been medically neglected and were malnourished, father's whereabouts were unknown, and mother was hospitalized and had tested positive for methamphetamine.  The court granted the Department temporary legal custody of the children, and the Department placed them with foster parents who had previously adopted an older sibling.[1]

¶ 3     Father and mother admitted the petition, and the court adopted treatment plans for them.  At that time, mother had just been discharged from the hospital.  As relevant here, both parent's treatment plans required them to (1) cooperate with case professionals; (2) complete a mental health and substance abuse

---

[1] The older sibling had been party to an earlier dependency and neglect case involving both parents.  That case ended in termination of parental rights.

evaluation and follow any recommendations; (3) submit to urinalysis (UA) testing; (4) engage in parenting time; (5) engage in life skills services; and (6) maintain stable housing and demonstrate an ability to provide for the children. Father's plan additionally required him to cease all criminal activity.

¶ 4     Later, the Department moved to terminate parents' parental rights. Twenty months after the court adopted mother's treatment plan and eighteen months after it adopted father's treatment plan, the court granted the Department's motion.

## II.     Termination Criteria and Standard of Review

¶ 5     The juvenile court may terminate parental rights if it finds, by clear and convincing evidence, that (1) the child was adjudicated dependent and neglected; (2) the parent hasn't complied with an appropriate, court-approved treatment plan or the plan hasn't been successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change within a reasonable time. § 19-3-604(1)(c), C.R.S. 2024.

¶ 6     Whether a juvenile court properly terminated parental rights presents a mixed question of fact and law because it involves application of the termination statute to evidentiary facts. *People in*

2

*Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 15.  We review the juvenile court's findings of evidentiary fact — the raw, historical data underlying the controversy — for clear error and accept those findings if they have record support.  *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10.  But we review de novo the juvenile court's legal conclusions based on those facts.  *Id.*  For instance, the ultimate determination of whether a department made reasonable efforts is a legal conclusion we review de novo.  *People in Interest of A.S.L.*, 2022 COA 146, ¶ 8.

### III.    Americans with Disabilities Act

¶ 7        Mother contends that the juvenile court erred by terminating her parental rights because the Department didn't provide reasonable accommodations for her alleged disabilities under the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12101-12213.

¶ 8        Mother concedes that, while the case was pending in the juvenile court, she never raised the question of whether she was an individual with a qualified disability under the ADA or identified any reasonable accommodations required by the ADA.  We therefore decline to address mother's assertion because a parent cannot raise

3

noncompliance with the ADA for the first time on appeal. *See People in Interest of S.Z.S.*, 2022 COA 133, ¶ 18; *see also People in Interest of M.B.*, 2020 COA 13, ¶ 14 ("[A]ppellate courts review only issues presented to and ruled on by the lower court.").

¶ 9 Mother nonetheless urges us to address her unpreserved assertion that the ADA applied to her because failure to do so would result in a miscarriage of justice. *See People in Interest of E.S.*, 2021 COA 79, ¶ 14. We decline to do so because the miscarriage of justice exception is a narrow one and because resolving this issue would require factual findings only the juvenile court can make about whether mother had a "qualified disability" under the ADA, what reasonable accommodations she was entitled to, and whether the Department provided those accommodations. *See People in Interest of M.B.*, 2020 COA 13, ¶¶ 23-24, 35 (describing the exception as a "narrow" one and declining to apply it in part because of the lack of necessary findings by the juvenile court); *see also S.Z.S.*, ¶ 21 ("[B]ecause mother never raised the ADA issue . . . either before or during the termination hearing, the juvenile court didn't make any specific findings about the applicability of the ADA for us to review. And we 'don't (and, indeed, can't) make findings of

4

fact.'" (quoting *Carousel Farms Metro. Dist. v. Woodcrest Homes, Inc.*, 2019 CO 51, ¶ 19)); *People in Interest of S.K.*, 2019 COA 36, ¶ 21 n.2 (whether a parent is a qualified individual with a disability under the ADA requires a fact-specific determination that a juvenile court must resolve).

## IV.    Reasonable Efforts

¶ 10    Intertwined with her ADA argument, mother also contends that the Department didn't make reasonable efforts to rehabilitate her.  We perceive no error.

## A.    Applicable Law

¶ 11    In considering a parent's fitness, a court must evaluate whether the Department's reasonable efforts have been unable to rehabilitate the parent.  § 19-3-604(2)(h); *People in Interest of S.N-V.*, 300 P.3d 911, 915 (Colo. App. 2011).  "'Reasonable efforts' . . . means the exercise of diligence and care . . . for children . . . who are in foster care or out-of-home placement . . . ." § 19-1-103(114), C.R.S. 2024.

¶ 12    The Department makes reasonable efforts if it provides services in accordance with section 19-3-208, C.R.S. 2024.  *See People in Interest of J.A.S.*, 160 P.3d 257, 262 (Colo. App. 2007).

5

Such reasonable efforts include screening, assessments, home-based family and crisis counseling, information and referral services to available public and private assistance resources, visitation services for parents with children in out-of-home placement, and placement services including foster care. § 19-3-208(2)(b). Additional services should be made available if they are determined to be necessary and appropriate by the case plan and there is adequate funding for them. § 19-3-208(2)(d). Examples of these additional efforts include transportation to required services when other transportation is not available, mental health services, and drug and alcohol treatment services. *Id.*

¶ 13    The parent is responsible for using the provided services to obtain the assistance needed to comply with the treatment plan's requirements. *People in Interest of J.C.R.*, 259 P.3d 1279, 1285 (Colo. App. 2011).

## B.    Analysis

¶ 14    Mother claims that the Department's efforts were not reasonable because they didn't include support for her medical needs. But we agree with the juvenile court's findings that the Department "made reasonable efforts to individually assess

6

[mother's] therapeutic needs, provide accommodation for her medical condition, and utilize different treatment and modalities and service providers to best meet [her] treatment needs" and that the treatment plan was not successful because mother "demonstrated a pattern of starting and stopping services, without integrating the treatment."

¶ 15    The Department considered mother's medical needs when supporting her progress with her treatment plan objectives. For instance, the caseworker testified that mother communicated "really well" and opined that mother succeeded with the treatment plan's first objective while acknowledging that, due to mother's health issues, she didn't have a perfect record of communication.

¶ 16    The Department also provided a referral for a dual mental health and substance use evaluation, which Mother completed. The evaluation recommended intensive outpatient substance abuse therapy sessions, but mother's illness made travel challenging. The caseworker therefore arranged virtual therapy sessions for mother, but she did not engage. Mother completed a substance abuse evaluation through another agency, which also agreed to provide therapy virtually. But, again, mother didn't engage. The provider

then recommended an in-person therapy group. Mother completed an intake appointment but never attended group sessions. Meanwhile, mother was engaged with virtual mental health therapy for several months before she took the evaluation. The provider offered virtual and in-person sessions expressly to meet mother's health needs while also supporting her therapeutic engagement. Nevertheless, over time, mother didn't progress in mental health therapy and didn't integrate what she had learned. Therefore, mother was only partially successful with this objective.

¶ 17    With regard to sobriety testing, mother's illness made travel to UA testing sites challenging, so the Department "allowed [her] to do drug patches" instead. And the caseworker transported mother weekly to get the patches replaced. Later, mother developed a reaction to the patches' adhesive, so the Department arranged UA testing. All of mother's drug patch tests and an initial UA test were positive for methamphetamine. However, the UA tests she submitted for the following four months all indicated only the use of THC. Mother then stopped submitting UA tests altogether, explaining that she "felt like [she] had demonstrated a sufficient amount of sobriety at that point." However, she admittedly had a

relapse with methamphetamine around the time she stopped submitting the UA tests. She never submitted another one. The Department also offered hair follicle testing to mother, which she refused. At the time of the termination hearing, mother hadn't demonstrated sobriety for about ten months. Therefore, she wasn't successful with this treatment plan objective.

¶ 18    Mother also had family time throughout the case, including when she was hospitalized. After mother was discharged, she had twice-weekly, two-hour long, supervised family time sessions with a parenting coach. The caseworker testified that mother did well with this objective, and mother's family time was expanded over the course of the case. But the caseworker never recommended unsupervised visits, in part because mother was uncomfortable with visits in the community and in part because of concerns with mother's failure to demonstrate her sobriety. The caseworker opined that, given these constraints, the children didn't see mother as their primary caregiver.

¶ 19    Additionally, the caseworker referred mother to two life skills workers. Among other things, the workers were available to transport mother to family time, drug patch replacement, and UA

testing. The caseworker testified that the Department provided transportation through life skills because of mother's health issues.

¶ 20 With some support from the caseworker and the life skills workers, mother — who initially lived in a homeless shelter and then with a relative whose home was not appropriate for the children — secured a new apartment shortly before the termination hearing. Thus, mother made progress on this objective, though as of the time of the termination hearing the caseworker hadn't yet visited the apartment and wasn't yet prepared to say that mother had demonstrated an ability to maintain a safe home for the children.

¶ 21 Thus, the record demonstrates that the Department provided ample support for each of mother's treatment plan objectives, tailored to her individual needs and limitations (including her limitations with traveling outside her home). To the extent that mother suggests the Department should also have sought releases of information from mother's physicians for guidance on how to support her medical needs, she points to no legal authority, and we aren't aware of any, that the Department was required to do this to satisfy the reasonable efforts requirement. Moreover, the

caseworker's testimony indicates that she encouraged mother to get guidance from her doctors on how to "get[] into treatment around her [condition]," but mother herself never did.

¶ 22 Overall, the record supports the court's factual findings, and we conclude that the Department made reasonable efforts to support mother's success with her treatment plan's objectives, including supporting her medical needs. The record also supports the conclusion that, despite these efforts, mother didn't engage in certain crucial aspects of her treatment plan.

## V. Fitness Within a Reasonable Time

¶ 23 The juvenile court, considering the conditions and needs of the children, the parents' lack of compliance with their treatment plans, the length of the case, and the chronic nature of the parents' issues, concluded that "the parents are not likely to demonstrate sufficient change in a reasonable time" and that "additional time would not serve the best interests of the minor children." Both parents contend that this finding was error. We are not persuaded.

## A. Applicable Law

¶ 24 An unfit parent is one whose conduct or condition renders the parent unable or unwilling to give a child reasonable parental care.

*People in Interest of D.P.*, 160 P.3d 351, 353 (Colo. App. 2007). Reasonable parental care requires, at a minimum, that the parent provide nurturing and protection sufficiently adequate to meet the child's physical, emotional, and mental needs and conditions. *People in Interest of A.J.*, 143 P.3d 1143, 1152 (Colo. App. 2006). A parent's noncompliance with a treatment plan generally "demonstrates a lack of commitment to meeting the child's needs and, therefore, may also be considered in determining unfitness." *People in Interest of D.P.*, 181 P.3d 403, 408 (Colo. App. 2008).

¶ 25 When deciding whether a parent's conduct or condition is likely to change within a reasonable time, the juvenile court may consider whether any change has occurred during the proceeding, the parent's social history, and the chronic or long-term nature of the parent's conduct or condition. *People in Interest of D.L.C.*, 70 P.3d 584, 588-89 (Colo. App. 2003). Where a parent has made little to no progress on a treatment plan, the court need not give the parent additional time to comply. *S.Z.S.*, ¶ 24.

¶ 26 The determination of a reasonable period is fact-specific and varies from case to case. *People in Interest of D.Y.*, 176 P.3d 874, 876 (Colo. App. 2007); *see also S.Z.S.*, ¶ 25. A reasonable time is

not an indefinite time, and it must be determined by considering the child's physical, mental, and emotional conditions and needs. *S.Z.S.*, ¶ 25. And where, as in this case, a child is under six years old, the court must also consider the expedited permanency planning provisions, which require that the child be placed in a permanent home as expeditiously as possible. *See* §§ 19-1-102(1.6), 19-1-123, 19-3-702(5)(c), C.R.S. 2024.

## B. Mother's Contention

¶ 27 Mother contends that, at the time of the termination hearing, she was succeeding in her treatment plan and "there was no evidence that the [c]hildren would suffer in any way if [she] were afforded a limited amount of additional time to demonstrate her sobriety." The record belies this contention.

¶ 28 As we detailed in the previous section, although mother had some success with her treatment plan objectives, the record shows that after nearly two years, she still hadn't fully engaged with or completed most of those objectives. In particular, at the time of the termination hearing, mother hadn't demonstrated sobriety for many months, hadn't engaged in substance abuse treatment, and hadn't integrated concepts from her mental health therapy. As a result,

many of the issues that had brought this case to the Department's attention persisted.

¶ 29     The caseworker testified that, because mother hadn't demonstrated sobriety, she had concerns that mother could not safely parent if the children were returned to her. And she pointed out that the children have their own medical needs and appointments, which she doubted mother could manage. For these reasons, the caseworker opined that mother could not become fit within a reasonable time.

¶ 30     Based on this record, we agree with the juvenile court's conclusion that mother was not likely to become fit within a reasonable time.

## C.     Father's Contention

¶ 31     Father contends that, despite personal setbacks he faced during the pendency of the case, including the death of both of his parents, he displayed an ability to comply with his treatment plan. But while he at times engaged in treatment and complied with some of his treatment plan objectives, overall, by the end of the case, he'd shown little overall progress on those objectives.

¶ 32     By the time of the termination hearing, nearly a year and a half after his treatment plan was adopted, father hadn't made much progress with the plan.  Although he had apparently managed to cease his criminal activity, he hadn't succeeded in any of his other treatment plan objectives.  The caseworker testified that he had attended only three or four family team meetings, and she hadn't had any contact with him for the last five months of the case.  He never completed his dual mental health and substance abuse evaluation or provided information that he was otherwise engaged in substance abuse or mental health treatment.  He submitted UA tests positive for THC and alcohol for several months and then stopped submitting tests altogether for the last ten months of the case.  He didn't consistently attend the first several months of family time.  And while he then attended family time regularly for a two-month period, he stopped attending altogether ten months before the termination hearing.  He was homeless for most of the case.  And the caseworker opined that he hadn't been able to demonstrate his capacity to meet the children's needs.

¶ 33     Based on these facts, the caseworker opined that father had had "significant time to engage in all the recommended services"

15

but had "not made much attempt at all." She further opined that it would not be in the best interests of the children for father to have more time to become fit.

¶ 34    This record supports the court's findings, and our conclusion, that father could not become fit within a reasonable time, especially given the young children's needs.

## VI.    Less Drastic Alternative

¶ 35    Finally, both parents contend that the juvenile court erred in concluding that termination of parental rights was in the children's best interests. Specifically, both parents argue that the Department failed to appropriately investigate the possibility of an allocation of parental responsibilities (APR) with the children's maternal uncle.

### A.    Applicable Law and Standard of Review

¶ 36    The juvenile court must consider and eliminate less drastic alternatives before it terminates the parent-child legal relationship. *People in Interest of L.M.*, 2018 COA 57M, ¶ 24. When considering less drastic alternatives, the court bases its decision on the best interests of the child, giving primary consideration to the child's physical, mental, and emotional conditions and needs. *Id.* at ¶ 29; *see also* § 19-3-604(3). For a less drastic alternative to be viable, it

16

must do more than "adequate[ly]" meet a child's needs; rather, it must be the "best" option for the child.  *A.M.*, ¶ 27.

¶ 37　When the juvenile court considers the availability of an APR and still determines that termination is in a child's best interests, we must affirm the court's decision if its findings are supported by the record.  *People in Interest of B.H.*, 2021 CO 39, ¶ 80.

### B.　Analysis

¶ 38　The juvenile court found that the Department evaluated a number of family members, including maternal uncle, as potential permanent placements for the children.  It concluded that, considering the children's needs, the length of time the children had been placed outside the home, and the foster family's preference for adoption, there were no less drastic alternatives to termination. The record supports these findings.

¶ 39　The caseworker testified that she investigated several relatives for placement, including paternal grandparents, a paternal cousin, and maternal step-grandfather, but none were available for the children.

¶ 40　While the record shows that maternal uncle wished to be a placement for the child, he didn't have an appropriate place for the

children to live. The children had been placed with him for a day at the start of the case, when father's whereabouts were unknown and mother was hospitalized. But maternal uncle's landlord refused to allow the children to reside in maternal uncle's apartment, which he shared with a few other men, and maternal uncle wasn't financially able to find a different home where the children could reside with him. As of the time of the termination hearing, maternal uncle was still living in that residence.

¶ 41 The caseworker also reported that the foster parents preferred adoption to an APR. And she testified that, given the children's young age, they need the permanency of adoption.

¶ 42 We conclude that the court did not err in finding that clear and convincing evidence showed there was no less drastic alternative to termination. *See B.H.*, ¶ 80.

VII. Disposition

¶ 43 The judgment is affirmed.

JUDGE FOX and JUDGE LUM concur.

18