The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
January 23, 2020

## 2020COA13

**No. 19CA0760, *People in Interest of M.B.* — Juvenile Court — Dependency and Neglect — Termination of the Parent-Child Legal Relationship — Uniform Parentage Act — Pretrial Proceedings**

In this termination of parental rights case, a division of the court of appeals affirms the paternity determination in favor of the biological father as to the child. In doing so, the division addresses whether, in a dependency and neglect proceeding, paternity must be resolved "as soon as practicable" — the standard under the Uniform Parentage Act, sections 19-4-101 to -130, C.R.S. 2019. The division also declines to review unpreserved due process and equal protection contentions under the plain error doctrine, but does so for a miscarriage of justice.

COLORADO COURT OF APPEALS      **2020COA13**

Court of Appeals No. 19CA0760
Arapahoe County District Court No. 18JV43
Honorable Natalie T. Chase, Judge

The People of the State of Colorado,

Appellee,

In the Interest of M.B., a Child,

and Concerning B.B.,

Appellant.

## JUDGMENT AFFIRMED

Division A
Opinion by JUDGE WEBB
Bernard, C.J., and Casebolt*, J., concur

Announced January 23, 2020

Ron Carl, County Attorney, Linda Arnold, Assistant County Attorney, Aurora, Colorado, for Appellee

Brittany Radic, Guardian Ad Litem

Debra W. Dodd, Office of Respondent Parents' Counsel, Berthoud, Colorado, for Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2019.

¶ 1    In this termination of parental rights case as to M.B. (the child), the juvenile court's paternity determination raises a novel question about whether, in a dependency and neglect proceeding, paternity must be resolved "as soon as practicable" — the standard under the Uniform Parentage Act, sections 19-4-101 to -130, C.R.S. 2019 (UPA).  B.B., whom the juvenile court found to be a presumptive father of the child, appeals the court's order that J.G. (biological father) — another presumptive father — is the child's legal father.  According to B.B., the court erred in two ways.  First, by not resolving the child's paternity until more than one year into the proceeding, the court violated the UPA, resulting in a denial of due process.  Second, by adjudicating the child as to biological father but not as to B.B., and then providing only biological father with a dispositional hearing and a treatment plan, the juvenile court subjected B.B. to disparate treatment that denied him equal protection.

¶ 2    The Arapahoe County Department of Human Services (the Department) disputes preservation of the due process and equal protection contentions.  We agree that these contentions were unpreserved.  Further, we decline B.B.'s invitation to extend the

1

plain error doctrine into dependency and neglect proceedings. And so, we refuse to address these contentions because B.B.'s due process argument does not implicate a miscarriage of justice, and because the record is inadequate to address equal protection as applied. Finally, turning to the merits, we reject B.B.'s statutory untimeliness argument and affirm the paternity determination in favor of biological father.

## I. Background

¶ 3     In January 2018, the Department filed a petition in dependency and neglect concerning the child and two other children, both of whom were B.B.'s biological children. Before filing the petition, the Department knew that although B.B. was not the child's biological father, he had signed the child's birth certificate. The petition identified B.B. as the child's "presumed father" and named John Doe as the "alleged father." A month later, the Department amended the petition to name biological father as the alleged father.

¶ 4     When the petition was filed, all of the children, their mother, and B.B. lived together. After the juvenile court ordered mother to leave the family home because of domestic violence, the children

remained with B.B.  Then in February 2018, the children were removed and later placed in foster care.  Biological father was never involved with the child, nor did he seek to become involved after being named in this action.

¶ 5     During a February 2018 hearing, B.B.'s counsel acknowledged receipt of a treatment plan for him, but the court deferred action on it.  At the adjudicatory and dispositional hearing on March 2, 2018, only the other two children were adjudicated as to B.B.  He agreed to a treatment plan that was then presented to and approved by the court.  The signature page component of the family services plan confirms that B.B. received a copy.  But because the treatment plan is not in the record, we must infer its contents from other documents.

¶ 6     The family services plan presented at the March 29, 2019, hearing identifies three objectives for B.B.: parenting time, caseworker contact, and a drug/alcohol evaluation.  The start date for the first and second objectives was January 31, 2018.  The start date for the third objective was March 2, 2018.  The last date is corroborated by discussion of substance abuse at the adjudicatory and dispositional hearing on March 2.  Importantly, the purpose of

the parenting time objective is "[t]o assist [the child] in developing and maintaining a positive and appropriate relationship with [B.B.]."

¶ 7 In June 2018, genetic testing established that biological father was the child's biological father. The following month, the court adjudicated the child as to biological father, although it had not yet determined that he was the child's legal father.[1] Then the Department proposed a treatment plan for him. Later, the Department moved to terminate biological father's parental rights, but it did not address those of B.B. at that time.

¶ 8 During a November 2018 hearing, B.B. asked the court, "Am I able to get involved with that myself so I can take custody of [the child]?" At a January 2019 hearing, the Department's counsel told the court that biological father "does not wish to be involved [with the child]." Then B.B. said that he was "asserting status as a psychological or any parentage toward [the child]."

¶ 9 Up to this point in the proceeding, neither the Department nor B.B. had requested a paternity hearing. Nor had the court

---

[1] We express no opinion on the propriety of this action.

4

determined paternity. When the Department requested a paternity determination, the court set a hearing for February 2, 2019. After the hearing was continued, the court discussed with the parties doing the paternity hearing and the termination hearing on the same day, with the termination hearing to follow the paternity determination.

¶ 10    After the court scheduled the hearings together, the Department filed an amended motion to terminate parental rights in the child, adding B.B. The combined hearings occurred on March 29, 2019. The Department told the court that biological father would confess the termination motion. Neither mother nor B.B. appeared. The court refused their counsels' request to participate by telephone.

¶ 11    The court took up paternity first. It heard testimony from the caseworker that B.B. had not seen the child since his removal from the family home; B.B. had not pursued visitation; neither B.B. nor biological father had "acted as a parent" to the child; both B.B.'s and biological father's treatment plans had been unsuccessful; and naming biological father as the child's father would be in the child's

best interests because if the child inquired, biological father could provide information about the child's biological roots.

¶ 12    The court treated paternity as a contest between two presumed fathers, found that biological father was the child's legal father, and excused counsel to B.B. from the hearing. The court explained that knowing who his biological parents were for medical purposes and family history would be in the child's best interests. It pointed out that at the start of the case, B.B. had told the Department that he did not want to pursue a relationship with the child; since the child was removed, he had not provided support for the child; he had not seen the child for over a year; and despite his November inquiry concerning a relationship with the child, he had not done anything to seek visitation.

## II.  Preservation

¶ 13    B.B. was represented by counsel throughout the dependency and neglect proceedings. His counsel never raised the due process or equal protection issues that B.B. now argues on appeal.

¶ 14    An action to terminate the parent-child legal relationship is a civil action. *See People in Interest of C.G.*, 885 P.2d 355, 357 (Colo. App. 1994). And so, like other civil actions, dependency and neglect

proceedings are subject to the limitation that except where jurisdiction is implicated, generally appellate courts review only issues presented to and ruled on by the lower court. *See, e.g., People in Interest of T.E.R.*, 2013 COA 73, ¶ 26 ("[T]o the extent that [mother] now argues an evidentiary hearing was required before the juvenile court could rule, she has waived this argument."); *People in Interest of A.L.B.*, 994 P.2d 476, 480 (Colo. App. 1999) ("[T]hat contention was not argued to the trial court at the conclusion of the evidentiary hearing. Hence, we decline to address it for the first time on appeal."); *People in Interest of V.W.*, 958 P.2d 1132, 1134 (Colo. App. 1998) ("[F]ather contends that the petition in dependency or neglect was insufficient because it did not allege abandonment as a potential ground for termination. Because the issue was not raised in the trial court, we decline to address it on appeal."); *People in Interest of T.S.*, 781 P.2d 130, 132 (Colo. App. 1989) ("Because mother failed to object in the trial court on the grounds now asserted, she is deemed to have waived any objection and cannot raise it on appeal.").

¶ 15     B.B. does not challenge the juvenile court's jurisdiction to determine paternity in a dependency and neglect proceeding. Nor

could he.  *See People in Interest of J.G.C.*, 2013 COA 171, ¶ 10 ("[W]e conclude that a paternity action may be joined with a dependency and neglect proceeding.").

¶ 16     Instead, B.B.'s reply brief responds to the Department's preservation challenge concerning due process that because, as a presumed father, he had a statutory right to a paternity determination, and his mere failure to request a paternity hearing cannot be deemed a waiver of his right to a prompt paternity determination.  The reply brief does not explain his failure to have preserved the equal protection argument.

¶ 17     Even accepting B.B.'s position on waiver, two questions remain unanswered.  First, why would disregard of a statutory timeliness requirement allow B.B. to raise a previously unarticulated due process claim?  And, second, why should B.B. be allowed to assert an as-applied equal protection violation for the first time on appeal?

A.  Review of Unpreserved Errors

¶ 18     B.B. requests plain error review of both his due process and equal protection claims.  But plain error derives from Crim. P. 52(b), which governs criminal cases: "Plain errors or defects affecting

8

substantial rights may be noticed although they were not brought to the attention of the court."[2]

¶ 19　By contrast, "[t]here is no civil rule analogue" to Crim. P. 52(b). *Wycoff v. Grace Cmty. Church of Assemblies of God*, 251 P.3d 1260, 1269 (Colo. App. 2010). So, appellate courts apply plain error only in the "'rare' civil case, involving 'unusual or special' circumstances — and even then, only 'when necessary to avert unequivocal and manifest injustice.'" *Id.* (quoting *Harris Grp., Inc. v. Robinson*, 209 P.3d 1188, 1195 (Colo. App. 2009)).

¶ 20　In Colorado, manifest injustice has never been applied to address an unpreserved issue in a dependency and neglect proceeding. However, such issues have been reviewed to prevent a miscarriage of justice. *In re R.G.B.*, 98 P.3d 958, 959 (Colo. App. 2004) ("Where an error of the trial court is considered fundamental or involves a miscarriage of justice, we may consider the issue for the first time on appeal."); *People in Interest of A.E.*, 914 P.2d 534,

---

[2] Under this rule, appellate courts apply a three-part plain error analysis. *See, e.g.*, *Deleon v. People*, 2019 CO 85, ¶ 38 ("Plain error occurs if there is (1) an error, (2) that is obvious, and (3) that so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction.").

539 (Colo. App. 1996) ("This case presents one of those limited situations in which an error by the trial court, not otherwise properly preserved for appeal, should be characterized as fundamental or one causing a miscarriage of justice . . . ."); *People in Interest of T.A.F. v. B.F.*, 624 P.2d 349, 353 (Colo. App. 1980) (citing C.A.R. 1(d)). But these cases do not mention plain error.[3] Nor do they cite Crim. P. 52(b).[4]

¶ 21    Of course, "we are not bound to follow decisions of other divisions of this court." *Roque v. Allstate Ins. Co.*, 2012 COA 10, ¶ 20. Still, given the constitutional nature of parental rights, we will recognize a miscarriage of justice exception for review of unpreserved errors. *See, e.g., People in Interest of C.G.*, 2015 COA

---

[3] In *People in Interest of M.B. v. J.B.*, 188 Colo. 370, 376, 535 P.2d 192, 196 (1975), the supreme court said, without analysis, "[w]here the object of the amended petition was to terminate parental rights, it was plain error to proceed to the dispositional hearing in the absence of counsel for the children."

[4] The lack of reference to Crim. P. 52(b) is unsurprising because following that path to discern a miscarriage of justice would first require deciding if review is a matter of grace or right. *See People v. Butcher*, 2018 COA 54M, ¶ 26 ("Following *Olano*, we conclude that relief under Crim. P. 52(b) is a matter of discretion, not of right.") (*cert. granted* Apr. 22, 2019). If review is a matter of right, the reviewing court would then have to consider obviousness and resolve whether undermining fundamental fairness is a different standard than miscarriage of justice.

106, ¶ 44 ("Moreover, the issue of what efforts due diligence requires before a parent may be served by publication under section 19-3-503(8)(b) affects parental rights of constitutional magnitude.").

¶ 22    The parties do not cite, nor have we found, a Colorado case defining "miscarriage of justice." And we have not found an out-of-state case doing so in the context of terminating parental rights.

¶ 23    Criminal cases in other jurisdictions have defined this phrase narrowly. *See, e.g.*, *Calderon v. Thompson*, 523 U.S. 538, 559 (1998) ("'[T]he miscarriage of justice exception is concerned with actual as compared to legal innocence.' We have often emphasized 'the narrow scope' of the exception." (quoting *Sawyer v. Whitley*, 505 U.S. 333, 339, 340 (1992))); *Trenkler v. United States*, 536 F.3d 85, 99 (1st Cir. 2008) ("The Supreme Court has defined the term 'miscarriage of justice' as encompassing only those 'extraordinary instances when a constitutional violation probably has caused the conviction of one innocent of the crime.'" (quoting *McCleskey v. Zant*, 499 U.S. 467, 494 (1991))); *Jeremias v. State*, 412 P.3d 43, 49 (Nev. 2018) (miscarriage of justice "defined as a 'grossly unfair' outcome").

¶ 24    The comparatively fewer civil cases applying this test also take a narrow view. *See, e.g.*, *Huffman v. Interstate Brands Corp.*, 17 Cal. Rptr. 3d 397, 407 (Ct. App. 2d Dist. 2004) ("In civil cases, a miscarriage of justice should be declared only when the reviewing court, after an examination of the entire cause, including the evidence, is of the opinion that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."); *Risko v. Thompson Muller Auto. Grp., Inc.*, 20 A.3d 1123, 1133 (N.J. 2011) (A "miscarriage of justice" has been described as a "pervading sense of 'wrongness' needed to justify [an] appellate or trial judge undoing of a jury verdict . . . [which] can arise . . . from manifest lack of inherently credible evidence to support the finding, obvious overlooking or undervaluation of crucial evidence, [or] a clearly unjust result . . . ." (quoting *Lindenmuth v. Holden*, 685 A.2d 1351, 1354 (N.J. Super. Ct. App. Div. 1996))); *see also* Black's Law Dictionary 1195 (11th ed. 2019) (miscarriage of justice means "[a] grossly unfair outcome in a judicial proceeding").

¶ 25    But because B.B.'s due process argument would not get over even a much lower bar, we need not decide whether the bar is so

12

high in a dependency and neglect case. And the equal protection argument suffers from a fatally inadequate record, independent of lack of preservation.

## B. Due Process

¶ 26    Even if we accept everything that B.B. says about nonwaiveability of his statutory right to a prompt paternity hearing and the necessity to resolve paternity before parental rights can be terminated, he fails to explain how mere delay in determining paternity deprived him of due process. *Cf. People in Interest of J.W. v. C.O.*, 2017 CO 105, ¶ 35 ("[T]he trial court's failure to enter a written adjudication order confirming the children's status prior to terminating the parent-child legal relationship did not impair the fundamental fairness of the proceedings or deprive Mother of due process."). After all, the juvenile court held a hearing on B.B.'s status as a presumed father, just not as quickly as he now wishes it had. And other than timeliness, B.B. does not identify *any* UPA procedure that he was denied.

¶ 27    Instead, B.B. points out that he did not receive a treatment plan, assistance from the Department, an adjudication, or a dispositional hearing. But even assuming that he was entitled to

these statutory procedures, he cites no authority supporting his characterization of the failure to receive a treatment plan or assistance from the Department as a due process issue. *See* § 19-3-507(1)(b), C.R.S. 2019 (services); § 19-3-508(1)(e)(I), C.R.S. 2019 (treatment plan). Nor does he cite any authority that entitles a presumed father to either a treatment plan or departmental assistance, much less to an adjudicatory or a dispositional hearing. *See* § 19-3-505(2), C.R.S. 2019 (adjudicatory hearing); § 19-3-507(1)(b) (dispositional hearing).

¶ 28　In any event, statutorily created rights are not constitutional rights and are not necessarily fundamental rights. *See, e.g.*, *People v. Owen*, 122 P.3d 1006, 1009 (Colo. App. 2005) ("A violation of a statutory right to speedy trial does not create a fundamental, constitutional bar to the court's power to enter a conviction and sentence."); *People v. Martinez*, 83 P.3d 1174, 1181 (Colo. App. 2003) ("[T]he right of allocution is a statutory right, not a constitutional one . . . .").

¶ 29　True, in dependency and neglect proceedings, some statutory rights are fundamental. For example, "the statutory right to counsel in a termination of parental rights proceeding" has been

14

held to ensure "that respondent parents receive fundamentally fair procedures." *People in Interest of A.R.*, 2018 COA 176, ¶ 10 (*cert. granted* Mar. 4, 2019). But along the continuum from constitutional to fundamental to mere statutory rights, B.B.'s argument that the court should have resolved paternity more quickly does not elevate this statutory right to a fundamental or constitutional right. *See Owen*, 122 P.3d at 1009.

¶ 30    By contrast, in dependency and neglect actions, "[p]rocedural due process requires that a parent be given notice of the proceedings, an opportunity to be heard, and the assistance of legal counsel. These rights are satisfied if the parent appears through counsel and is given the opportunity to present evidence and cross-examine witnesses." *People in Interest of A.E.L.*, 181 P.3d 1186, 1192 (Colo. App. 2008).

¶ 31    When the juvenile court held a paternity hearing, albeit later than B.B. belatedly asserts it should have, B.B. enjoyed all of these opportunities. B.B. received ample prior notice of the hearing date, but for reasons known only to him did not appear.

¶ 32     Still, his counsel participated.  Counsel could have called witnesses, but chose not to do so.  And counsel made a closing argument.  Due process requires no more.

¶ 33     For these reasons, we need not take up the unpreserved due process argument to prevent a "miscarriage of justice."[5]

## C.  Equal Protection

¶ 34     Divisions of this court are divided on taking up unpreserved equal protection arguments in dependency and neglect cases. *Compare In re M.G.*, 58 P.3d 1145, 1147 (Colo. App. 2002) ("Petitioner also asserts that [section] 19-1-117[, C.R.S. 2001,] violates her right to equal protection under the United States Constitution.  However, that argument is raised for the first time on appeal, and we will not consider it."), *and People in Interest of J.L.P.*, 870 P.2d 1252, 1259 (Colo. App. 1994) ("The [guardian ad litem (GAL)] also argues that the application of the BIA Guidelines without consideration of the best interests of the child violates the Equal Protection Clause of the Fourteenth Amendment and Colo.

---

[5] In saying this much, we take care to point out that we do not foreclose the possibility of a due process violation producing a miscarriage of justice.

16

Const., Art. II, § 25. However, we do not address this issue because it was raised for the first time in the reply brief."), *with People in Interest of C.E.*, 923 P.2d 383, 384-85 (Colo. App. 1996) (The division entertained maternal aunt's unpreserved argument that "extended family members have a fundamental liberty interest in the society and custody of kindred children," because "the issues here [including equal protection] concern alleged fundamental constitutional rights and have been fully briefed by the parties.").

¶ 35 On this record, we need neither pick a side nor factor miscarriage of justice into the calculus. B.B. does not assert facial unconstitutionality, so his equal protection argument must be considered as applied. *In re Estate of Becker*, 32 P.3d 557, 561 (Colo. App. 2000), *aff'd*, 54 P.3d 849 (Colo. 2002). But because the juvenile court made no findings concerning the alleged disparity in treatment plans and other procedures as between B.B. and biological father, "[i]nadequacy of the record also disfavors addressing an as-applied challenge for the first time on appeal." *People v. Mountjoy*, 2016 COA 86, ¶ 37 (collecting cases), *aff'd on other grounds*, 2018 CO 92M.

¶ 36    For example, the court could have addressed the reasons for and significance of any differences between B.B.'s treatment plan, apparently for all three children, and biological father's treatment plan for the child.  At the August 2018 hearing, the court told B.B., "I would really expect that you were further along with your treatment plan."  But no one gave the court any reason to undertake a comparative analysis of biological father's treatment plan.

¶ 37    True, only the other two children, but not M.B., were adjudicated as to B.B. in March 2018.  The court did not explain this anomaly.  Still, at the May 2018 permanency planning hearing, the court proceeded as if all three children had been adjudicated when it "adopt[ed] trifecta goals of return home, APR, and adoption" for all of them as to B.B.

¶ 38    For these reasons, we also decline to take up the equal protection argument.  But B.B.'s statutory argument remains to be addressed.

## III. Paternity Determination

## A. Standard of Review and Law

¶ 39 The parties agree that a paternity determination is subject to the clearly erroneous standard of review under C.R.C.P. 52. *See People in Interest of A.A.T.*, 191 Colo. 494, 497, 554 P.2d 302, 305 (1976) ("[T]here was sufficient evidence to support a finding of paternity. Findings of the trial court will not be disturbed on review, unless they are clearly erroneous. C.R.C.P. 52.").

¶ 40 Interpretation of the UPA, like that of any statute, is de novo. *See L.A.N. v. L.M.B.*, 2013 CO 6, ¶ 13 ("We first review . . . the dependency and neglect provisions of the Children's Code, sections 19-3-100.5 to 19-3-703, C.R.S. (2012), de novo . . . .").

¶ 41 Because the juvenile court held a paternity hearing, the only procedural question is the timeliness of that hearing. Even in the face of a statutory limit on timing, trial courts enjoy some discretion. *In re H & R Block*, 159 S.W.3d 127, 130 (Tex. App. 2004) ("'[A]s soon as practicable' indicates a discretionary authority in the trial court to determine the appropriate time for ruling on a motion . . . ."). "A court abuses its discretion when its ruling is

manifestly arbitrary, unreasonable, or unfair." *People in Interest of T.M.S.*, 2019 COA 136, ¶ 43.

¶ 42 Under the UPA, a paternity action can be commenced by "a county department of human or social services" as well as by a presumed father, among others. § 19-4-107(1), C.R.S. 2019. A man is presumed to be the natural father of a child if, as relevant here, "[h]e acknowledges his paternity of the child in a writing filed with the court or registrar of vital statistics" or genetic testing establishes "that the probability of his parentage is ninety-seven percent or higher." § 19-4-105(1)(e), (f), C.R.S. 2019.[6]

¶ 43 Where two or more conflicting presumptions of paternity arise and no presumption has been rebutted by clear and convincing evidence, "the presumption which on the facts is founded on the weightier considerations of policy and logic controls." § 19-4-105(2)(a). In balancing these considerations, "the judge or magistrate shall consider all pertinent factors, including but not limited to" eight factors listed in the statute. *Id.* Then, "[t]he result

---

[6] A presumption of paternity may arise under a variety of circumstances as provided by section 19-4-105(1)(a)-(f), C.R.S. 2019.

of a final determination of paternity is to render one presumptive father the child's parent. The other presumptive father becomes a nonparent who does not have rights to visit a child or to make any decisions about the child's education, health, or upbringing." *People in Interest of C.L.S.*, 313 P.3d 662, 667 (Colo. App. 2011).

¶ 44 The UPA requires that "an informal hearing" be held "[a]s soon as practicable after an action to declare the existence or nonexistence of the father-child relationship has been brought" if the court determines holding a hearing to be "in the child's best interest." § 19-4-111(1), C.R.S. 2019. Unsurprisingly, parentage disputes are usually resolved on that basis. *See, e.g., N.A.H. v. S.L.S.*, 9 P.3d 354, 358 (Colo. 2000) ("The magistrate held a hearing on the issue . . . ."); *C.L.S.*, 313 P.3d at 664 ("After a hearing, the magistrate entered a series of findings.").

¶ 45 B.B. does not cite, nor have we found, a Colorado case holding that where a paternity question arises in an ongoing dependency and neglect proceeding, the "as soon as practicable" requirement applies.

## B. Application

### 1. B.B. Was a Presumed Father

¶ 46 The Department named B.B. as the child's presumed father in its initial dependency and neglect petition and referred to him as the child's "adoptive father" in several family services plans. At the first hearing in January 2018, the GAL told the juvenile court that B.B. "is on [the child]'s birth certificate." Although the birth certificate is not in the record, in opening statement at the paternity hearing, the Department told the court, "We have a situation of [B.B.] being on the birth certificate." Several witnesses testified that B.B. was on the birth certificate.

¶ 47 At the conclusion of the paternity hearing, the court noted that B.B. "has raised the presumption of being on [the child]'s birth certificate, essentially holding [the child] out [as] his own in that regards." Then the court turned to "weighing and determining a legal father between two competing presumptions of paternity." Under these circumstances, the absence of more particularized findings, such as whether mother was notified of B.B.'s paternity acknowledgment and whether she disputed it under section 19-4-105(1)(e), is understandable.

¶ 48    For the first time on appeal, the Department argues that B.B. was not a presumed father. We conclude that the Department is judicially estopped from taking a position contrary to the position it took before the juvenile court, and which the court adopted, that B.B. was a presumed father. *See 23 LTD v. Herman*, 2019 COA 113, ¶ 65.

### 2. The Juvenile Court Held a Timely Hearing to Determine Whether B.B. Was the Child's Legal Father

¶ 49    During the January 22, 2019, hearing, immediately after B.B. told the court for the first time that he was asserting psychological parent status, the Department responded that it would need to amend the termination motion. Then the court said, "[W]e need to hold a paternity hearing." The court set the hearing for February 2 and told B.B. "I need you to be present on the phone for me to make those paternity findings."

¶ 50    When B.B. failed to appear, the court concluded, "I think we need notice just so our record's clear." Based on the court's schedule and counsel's availability, the paternity hearing was reset to March 29 (the same date as the termination hearing). It occurred on that date.

¶ 51    B.B. argues that this date was not "as soon as practicable" because the original petition named him as a presumed father and as of June 2018, genetic testing established biological father's status as another presumed father. So, he continues, the court was aware of competing presumptions that needed resolution before the dependency and neglect case could meaningfully proceed.

¶ 52    The phrase "as soon as practicable" has never been interpreted for purposes of section 19-4-111(1). Numerous Colorado cases have addressed the phrase in other contexts. For example, where the phrase appears in an insurance policy, it "means that notice must be given within a reasonable length of time under the circumstances." *Clementi v. Nationwide Mut. Fire Ins. Co.*, 16 P.3d 223, 226 (Colo. 2001).

¶ 53    Even assuming that the "as soon as practicable" requirement applies in a dependency and neglect proceeding, under the UPA, the temporal mandate applies only *after* "an action to declare the existence or nonexistence of the father-child relationship has been brought." § 19-4-111(1). To be sure, a paternity action can be joined with other proceedings. § 19-4-109(1), C.R.S. 2019. For purposes of starting the clock, a dependency and neglect proceeding

is not such an action. And without a discrete starting event, this standard cannot be meaningfully applied to test the court's exercise of its discretion.

¶ 54 Despite the difference between a dependency and neglect proceeding and "an action to declare the existence or nonexistence of the father-child relationship," B.B. argues that the juvenile court did not act "as soon as practicable" because the GAL's statements at the January 2018 hearing that "there are competing presumptions of paternity" teed up the paternity issue. But the GAL went on to request genetic testing. As indicated, the court did not receive the results until June 2018.

¶ 55 As for the six-month period from July 2018 until the January 22, 2019, hearing, B.B. asserts that because he was "left merely a presumed parent," he was not provided with either "a treatment plan to reunite with [the child]" or "any services from the Department, to reunite with [the child]." B.B.'s assertions miss the mark in two ways.

¶ 56 First, B.B. fails to address whether this six-month delay was "reasonable . . . under the circumstances," even if the clock had begun running, which we have concluded it had not. B.B. and his

counsel had ample opportunities to expedite the process by requesting a paternity hearing at the July or August hearings, but did not do so. Indeed, at the November 2018 hearing, B.B. raised his becoming involved with the child, but again said nothing about a paternity determination.

¶ 57 Second, B.B. would have been entitled to a treatment plan and services only *after* he was determined to be the legal father. *See In re Marriage of Ohr*, 97 P.3d 354, 357 (Colo. App. 2004) ("Intervenor's status as a presumptive father was extinguished when the court determined that, for all legal purposes, husband was the child's father."). But because the court ultimately ruled against B.B. and in favor of biological father on paternity, we need not undertake a retrospective analysis of alleged denial of the statutory rights that B.B. would have enjoyed, had he been held the child's legal father.

¶ 58 Even so, B.B. asserts that he would have been named the legal father, "had a timely paternity determination been made at the beginning of the case." But he does not explain why a different outcome might have resulted from an earlier paternity hearing. To the contrary, the record shows that from the onset of the case, the court was aware of another potential father and the need for the

26

genetic testing that was completed by June. Had B.B. desired to bolster his claim to becoming the child's legal father, he could have requested visitation during February, March, April, and May. He did not. Instead, according to the family services plan introduced at the paternity hearing, as of May 14, 2018, B.B. "had stated that he was not [the child's] biological father and had no interest in pursuing a relationship with him, so a parenting time-referral was not requested."

¶ 59 Finally, turning to the period between January 22 and March 29, 2019, B.B. does not discuss, nor can we discern, why a delay from February 2 to March 29 would not be "reasonable . . . under the circumstances." After all, one of the reasons was B.B.'s failure to appear or call in on February 2 and the purpose of the continuance was to ensure that he could not dispute the parentage determination for lack of notice.

¶ 60 Despite all of this, B.B. asserts multiple abuses of discretion, including the following: by leaving the two presumed fathers "in legal limbo for over a year," both of them were denied "the constitutional protections afforded by law"; the court adjudicated the child as to one of the presumed fathers, but never as to a legal

father; the Department failed to provide B.B. with "an adjudication, dispositional hearing, and treatment plan"; by determining paternity on the day of the termination hearing, the court accepted "an invalid confession [from biological father] which was premised on an invalid adjudication of a presumed father"; and even assuming that after "a timely paternity hearing was held the court found biological father was the legal father, [B.B.] could have immediately appealed that order to receive meaningful appellate review."

¶ 61     This somewhat overlapping parade of horribles suffers from three flaws.  First, most of them assume rights and procedures to which B.B. would have been entitled only after having been determined to be the child's legal father.  Second, some of them raise issues involving biological father, whose rights B.B. lacks standing to assert.  *See, e.g.*, *People in Interest of J.A.S.*, 160 P.3d 257, 261 (Colo. App. 2007) (one parent does not have standing to raise issues regarding the propriety of termination of the other parent's rights); *People in Interest of J.M.B.*, 60 P.3d 790, 792 (Colo. App. 2002) (father lacked standing to challenge the appropriateness of mother's treatment plan).  Third, B.B. does not explain how his

28

appeal is less "meaningful" than it would have been following a paternity determination as of mid-2018. *See Sinclair Transp. Co. v. Sandberg*, 2014 COA 75M, ¶ 14 n.1 (declining to address an assertion "presented without any developed argument"); *Barnett v. Elite Props. of Am., Inc.*, 252 P.3d 14, 19 (Colo. App. 2010) ("We will not consider a bald legal proposition presented without argument or development.").

¶ 62 In the end, the juvenile court acted within its discretion in holding the paternity hearing on March 29, 2019.

### C. The Juvenile Court Acted Within Its Discretion in Finding Biological Father to Be the Child's Legal Father

¶ 63 According to the opening brief, B.B. "appeals the court's order that he was not the legal father of [the child]." Similarly, the reply brief asks us to "reverse the trial court's paternity ruling." In support of this relief, B.B. makes three developed arguments: denial of his statutory right to a speedy paternity determination, denial of due process, and denial of equal protection. But the record shows that the due process and equal protection arguments were unpreserved; we have declined to exercise our discretion to

29

entertain either of them.  Next, we have addressed and rejected his statutory untimeliness argument.

¶ 64     Apart from these three assertions, B.B. has failed to develop any argument that the record did not support the finding that biological father was the child's legal father.  Therefore, we decline to revisit that finding.

## IV.  Conclusion

¶ 65     The order determining biological father to be the child's legal father is affirmed.

CHIEF JUDGE BERNARD and JUDGE CASEBOLT concur.