24CA0913 Peo in Interest of JMQ 02-27-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA0913
City and County of Denver Juvenile Court No. 22JV346
Honorable Laurie A. Clark, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of J.M.Q. and G.Q., Children,

and Concerning J.L.M. and K.J.Q.,

Appellants.

---

JUDGMENT AFFIRMED

Division III
Opinion by JUDGE DUNN
Tow and Meirink, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced February 27, 2025

---

Kerry Tipper, City Attorney, Amy J. Packer, Assistant City Attorney, Denver, Colorado, for Appellee

Josi McCauley, Guardian Ad Litem

Beth Padilla, Office of Respondent Parents' Counsel, Durango, Colorado, for Appellant J.L.M.

Robin Tieman, Office of Respondent Parents' Counsel, Boulder, Colorado, for Appellant K.J.Q.

¶ 1    J.L.M. (mother) and K.J.Q. (father) appeal the juvenile court's judgment terminating their parent-child legal relationships with J.M.Q. and G.Q. (the children).  We affirm.

## I.    Background

¶ 2    This case has a long history beginning in 2016 when the Adams County Department of Human Services (Adams County) opened a voluntary case — involving the children and two older siblings — to address concerns about medical neglect and domestic violence in the home.  When the parents did not comply with the treatment plans adopted in their voluntary case, the court removed then-two-year-old J.M.Q. and then-one-year-old G.Q. from the home.[1]

¶ 3    In 2017, the juvenile court adjudicated the children dependent or neglected and adopted treatment plans for the parents that required, among other things, that they engage in substance abuse evaluations and treatment.  In 2018, the court returned the children to the parents' care only to remove them again in 2019

---

[1] Parental responsibilities for the older two siblings were allocated to their maternal aunt and uncle with the parents receiving no family time.  That allocation is not before us.

after it found that the children had suffered medical neglect and that there were concerns about the parents' drug use.

¶ 4     In 2020, Adams County moved to terminate the parents' parental rights. After several days of testimony, the juvenile court judge recused herself and vacated the hearing.

¶ 5     In March 2021, the parents had another child, N.Q. Instead of resetting the termination hearing with respect to the children, after N.Q.'s birth, the court returned J.M.Q. and G.Q. to the parents' care in December 2021. But four months later, the court removed the children — along with N.Q. — again because of the parents' disengagement with their treatment plans and their suspected drug use.

¶ 6     In October 2022, venue changed from Adams County to Denver County because the Denver Department of Human Services (the Department) had filed a companion dependency and neglect case concerning N.Q. The juvenile court placed the children in foster care but allowed N.Q. to return to the parents' care.[2]

---

[2] N.Q.'s companion case is not before us.

¶ 7     The court adopted amended treatment plans for mother and father in December 2022. Mother's treatment plan required her to (1) manage her mental health issues and continue mental health therapy; (2) engage in drug and alcohol testing, remain sober, and talk with her mental health therapist about how her drug use impacted her parenting; (3) engage in family time; and (4) seek out supports through a domestic violence agency. Father's treatment plan required him to (1) complete a mental health evaluation and comply with any recommendations; (2) engage in drug and alcohol testing and remain sober; (3) participate in the Caring Dads Program; (4) engage in family time; and (5) complete a domestic violence evaluation and comply with any recommended treatment.

¶ 8     In October 2023, the Department moved to terminate mother's and father's parental rights. After a multiday hearing, the court granted the motion.

## II.     Indian Child Welfare Act of 1978

¶ 9     Mother and father state that it's not clear whether the Department complied with the due diligence requirements of the Indian Child Welfare Act of 1978 (ICWA), 25 U.S.C. §§ 1901-1963. But neither contend that the juvenile court erred by finding that

3

ICWA did not apply. Nor do they argue that ICWA does apply. Without any argument that the juvenile court erred, the parents haven't developed a viable claim for appellate consideration. *See Middlemist v. BDO Seidman, LLP*, 958 P.2d 486, 495 (Colo. App. 1997) (Certain claims were not properly presented for appeal when the appellant had "fail[ed] to identify any specific errors committed by the trial court . . . and provide[d] no legal authority to support an allegation that the trial court erred in making its rulings.").

## III. Reasonable Efforts

¶ 10 Each parent contends that the juvenile court erred by finding that the Department made reasonable efforts to rehabilitate them and reunify their family. We aren't convinced.

### A. Applicable Law

¶ 11 Before the juvenile court may terminate parental rights under section 19-3-604(1)(c), C.R.S. 2024, a department must make reasonable efforts to rehabilitate the parent and reunite the family. *See* §§ 19-1-103(114), 19-3-100.5(1), 19-3-208, 19-3-604(2)(h), C.R.S. 2024. "Reasonable efforts" means the "exercise of diligence and care" for a child who is in out-of-home placement. § 19-1-103(114).

4

¶ 12     Services provided in accordance with section 19-3-208 satisfy the reasonable efforts standard.  § 19-1-103(114); *see also People in Interest of E.S.*, 2021 COA 79, ¶ 19.  Among the services required under section 19-3-208 are screenings, assessments, and individual case plans for the provision of services; home-based family and crisis counseling; information and referral services to available public and private assistance resources; family time services; and placement services.  § 19-3-208(2)(b).

¶ 13     When evaluating a department's efforts, the juvenile court should consider whether the services provided were appropriate to support the parent's treatment plan.  *People in Interest of S.N-V.*, 300 P.3d 911, 915 (Colo. App. 2011).  But the parent is ultimately responsible for using those services to obtain the assistance needed to comply with the treatment plan.  *People in Interest of J.C.R.*, 259 P.3d 1279, 1285 (Colo. App. 2011).  And the court may consider a parent's unwillingness to participate in treatment in determining whether the department made reasonable efforts.  *People in Interest of A.V.*, 2012 COA 210, ¶ 12.

## B. Standard of Review

¶ 14 Whether a juvenile court properly terminated parental rights presents a mixed question of fact and law because it involves the application of the termination statute to evidentiary facts. *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 15. "We review the juvenile court's findings of evidentiary fact — the raw, historical data underlying the controversy — for clear error and accept them if they have record support." *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10. But we review de novo the juvenile court's legal conclusions based on those facts. *Id.* In particular, the ultimate determination of whether a department provided reasonable efforts is a legal conclusion we review de novo. *People in Interest of A.S.L.*, 2022 COA 146, ¶ 8.

## C. Reasonable Efforts to Rehabilitate Mother

¶ 15 The juvenile court determined that the Department made reasonable efforts to rehabilitate mother and "consistently reassessed the services offered, and the services needed to" reunify the family, resulting in multiple amendments to her treatment plan. The court acknowledged that mother at times engaged with the services but other times "resisted engagement" and that the

Department made new referrals to assist mother when needed, including, for example, "[m]ultiple types of therapy [and] modalities of therapy, as well as different types of parenting support." The court determined that these efforts were unsuccessful "through no fault of the Department." The record supports this determination.

¶ 16 All three caseworkers who worked with the family over the course of this case testified to mother's pattern of initially engaging with her treatment plan and then disengaging once the children returned to her care. They each described mother's inconsistent compliance with her treatment plan, including lapses of substance use and the lack of substance abuse monitoring, and her inability to maintain her mental health and sobriety while parenting.

¶ 17 The most recent caseworker to work with the family opined that mother would not be able to "handle [the children's] behavioral as well as emotional needs" and that, if they were placed back in the home, "we would go through the same cycle," which would "be detrimental for [the children's] emotional well-being." And despite the years of services and intervention provided to mother, the caseworker opined that mother had not changed her behavior and had not "successfully completed her treatment plan."

¶ 18    Still, mother asserts that, notwithstanding the breadth and duration of offered services, the Department did not make reasonable efforts because it did not provide family therapy "as recommended by its own expert." The record shows, however, that attempts were made to provide family therapy in August 2022, but the parents declined because they felt an additional service would be a stressor. The Department again placed a family therapy referral in June 2023, but the provider could not reach the parents to start the service. And a new referral was not made because both children's therapists thought it would be detrimental to them.

¶ 19    Mother also contends the Department failed to provide child-protective psychotherapy (CPT) as recommended by a departmental expert. While we acknowledge the Department didn't put in a referral for this therapy, the Department has "discretion to prioritize certain services or resources to address a family's most pressing needs in a way that will assist the family's overall completion of the treatment plan." *People in Interest of My.K.M. v. V.K.L.*, 2022 CO 35, ¶ 33; *see also S.N-V.*, 300 P.3d at 915. And, again, the record here supports the court's finding that the Department "consistently re-assessed the services offered and the services needed . . . to

reunify this family." It was mother's lack of consistent engagement — and not the Department's lack of efforts or the specific lack of CPT — that prevented mother's rehabilitation.

¶ 20 Given the totality of the services provided to mother, we can't conclude that the juvenile court erred by determining that the Department provided reasonable efforts to rehabilitate mother and reunify the family.

### D. Reasonable Efforts to Rehabilitate Father

¶ 21 The record also supports the juvenile court's determination that the Department provided reasonable efforts to rehabilitate father, including "referrals for services to address substance abuse and mental health."

¶ 22 The evidence shows the Department provided multiple referrals to address father's mental health and substance abuse needs but that father's engagement was inconsistent. He struggled with relapses and maintaining sobriety throughout the case. His most recent caseworker testified that as recently as 2023, the Department had referred father for substance abuse and mental health treatment, but father missed four individual therapy sessions and twenty-five group therapy sessions. At the

termination hearing, father admitted he was an addict and was not currently in recovery. And, despite intensive family time and parenting services, father's progress was inconsistent, and he still required supervised family time in 2023. Finally, although the Department referred father for domestic violence treatment, and father participated in a class, he did not complete a domestic violence evaluation as required by his treatment plan.

¶ 23 We are unpersuaded by father's contentions that (1) the caseworker did not maintain contact; (2) family time services were delayed; (3) visits were not moved to his home; (4) he did not receive in-home services; (5) he should have had life adaptive skills training; and (6) the Department was required to offer different services than Adams County had already provided. As to these specific points, the most recent caseworker testified as follows:

- She made several attempts every month to call father, and she also offered to meet at his workplace, but father did not provide his location.

- Family time services were not delayed due to a lack of referrals; rather, father did not follow up on opportunities to visit during those times of delay.

- She tried to assess the safety of father's home for visits in the months leading up to the termination, but despite efforts to do so, she could not reach father at home or at work.

- Adams County put in place in-home services to help the parents respond to the children's "high energy." The services began in January 2022. But within a few months, the parents' engagement in those services started to decline.

- The Department again made referrals for in-home services to assist the parents with managing the children's behaviors from December 2022 until June 2023. The services ended because the parents reported the services were no longer beneficial.

- A life skills worker was referred to the family in 2017 and again in 2022.

- The Department "implemented different services" than Adams County.

¶ 24 To the extent that father points to evidence which supports other inferences, it is the role of the juvenile court to weigh conflicting testimony and determine credibility. *See People in Interest of S.K.*, 2019 COA 36, ¶ 41.

11

¶ 25　Finally, father claims that the Department did not "make a case management approach," but he doesn't develop or explain this argument. We therefore decline to address it. *See Antolovich v. Brown Grp. Retail, Inc.*, 183 P.3d 582, 604 (Colo. App. 2007).

¶ 26　We agree with the juvenile court that the Department made reasonable efforts to rehabilitate father.

## IV.　Fitness

¶ 27　Mother also asserts that the juvenile court erred by finding her unfit and that termination was in the children's best interests. We disagree.

¶ 28　An unfit parent is one whose conduct or condition renders the parent unable or unwilling to give a child reasonable parental care. *S.K.*, ¶ 74. Reasonable parental care requires, at a minimum, that the parent provides nurturing and safe parenting sufficient to meet the child's physical, emotional, and mental needs and conditions. *Id.* In considering a parent's fitness, the court must consider the factors listed in section 19-3-604(2), including whether "[r]easonable efforts by child-caring agencies . . . have been unable to rehabilitate the parent or parents" and whether "on two or more occasions, a child in the physical custody of the parent has been

12

adjudicated dependent or neglected." § 19-3-604(2)(h), (l); *see also People in Interest of M.H.*, 10 P.3d 713, 715 (Colo. App. 2000) (considering some, but not all, of the statutory factors in determining whether the court's unfitness finding was supported).

¶ 29    The juvenile court found that, despite the Department's reasonable efforts, mother could not demonstrate the ability to meet the children's physical, mental, and emotional needs. *See* § 19-3-604(2)(h). The court also considered the fact that, on two or more occasions, a child in the physical custody of mother had been adjudicated dependent or neglected. *See* § 19-3-604(2)(i).

¶ 30    The record supports the court's findings. Testimony was presented that several children in mother's care had been adjudicated dependent or neglected on different occasions. And even though mother had made some progress on her treatment plan, her progress was inconsistent and ultimately not sufficient to rehabilitate her. The most recent caseworker testified that, at the time of termination, despite the Department's efforts, mother was not able to meet the children's needs, specifically their need for emotional well-being. And she explained that, given mother's past inconsistency, the Department could not "guarantee a removal not

13

happening again," which "would be a fourth removal for [the children]" and "could be detrimental for [them]."

¶ 31    An expert in clinical psychology who evaluated mother opined that mother struggled to maintain psychological stability and had experienced domestic violence "against the backdrop of longstanding substance abuse and with multiple relapses." He testified that he observed mother having "positive, but not necessarily healthy interactions with [the children]." And he gauged mother's prognosis for successful parenting to be "guarded to poor overall" because of her "longstanding dysfunction."

¶ 32    We therefore disagree with mother that that the juvenile court based its fitness determination on the "speculative conclusion" that mother would continue to manifest a pattern of being unable to be protective of the children's well-being.

¶ 33    The record also supports the juvenile court's finding that termination was in the children's best interests. The family's most recent caseworker testified that termination was in the children's best interest, opining that mother "exhibited patterns of engaging in treatment and not engaging in treatment, [she had] not successfully been in compliance the entirety of this case," and "[the children]

deserve[d] permanency after seven years of [the case] being open." And the clinical psychology expert opined that long-term impermanency creates "stress and strain" on children, making it more complicated for them to develop a sense of self and capacity.[3]

¶ 34 Given the record support for the juvenile court's findings that mother was unfit and that termination was in the children's best interest, we will not disturb them.

## V. Father's New Claims on Appeal

¶ 35 Father asserts that the juvenile court and the Department failed to provide him with reasonable accommodations for his disability as required by the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12101-12213, violating his constitutional equal protection and procedural due process rights.

¶ 36 Whether a person is a qualified individual with a disability under the ADA requires a case-by-case determination. *S.K.*, ¶ 21. If a parent's disability status is disputed, the juvenile court must

---

[3] We do not consider father's separate contention that the court erred by finding mother unfit because he lacks standing to raise it. *See People in Interest of M.B.*, 2020 COA 13, ¶ 61 (one parent does not have standing to raise issues regarding the propriety of termination of the other parent's rights).

first make a finding about whether the parent has a disability before it requires the department to provide the parent with reasonable accommodations. *See id.* at ¶ 21 n.2. Under the ADA, a disability includes "a physical or mental impairment that substantially limits one or more major life activities" of the person. 42 U.S.C. § 12102(1)(A).

¶ 37 A parent is responsible for disclosing to the department and the juvenile court information regarding a disability and any accommodations that are needed to address the disability. *S.K.*, ¶ 21. A party ideally should raise an ADA issue before the court adopts a treatment plan and enters a dispositional order so that the department can include any requested accommodations in a proposed treatment plan for the court's approval. *People in Interest of S.Z.S.*, 2022 COA 133, ¶ 16.

¶ 38 As we understand it, father now claims that he was sober at the time of the termination hearing and, given his substance use disorder, he had a protected disability under the ADA. Though he concedes he never raised this issue before the juvenile court, he urges us to address his unpreserved contention to avoid a miscarriage of justice. We decline to do that because we would

16

have to make factual findings about whether father had a "qualified disability" under the ADA, what reasonable accommodations he was entitled to, and whether the Department provided those accommodations. But we "don't (and, indeed, can't) make findings of fact." *Carousel Farms Metro. Dist. v. Woodcrest Homes, Inc.*, 2019 CO 51, ¶ 19; *see also S.Z.S.*, ¶ 21 ("[B]ecause mother never raised the ADA issue . . . either before or during the termination hearing, the juvenile court didn't make any specific findings about the applicability of the ADA for us to review.").

¶ 39 Thus, we will not consider father's unpreserved ADA and related due process and equal protection claims. *See People in Interest of E.D.*, 2025 COA 11, ¶ 66 n.3 (declining to address an issue not raised before the juvenile court for the first time on appeal).

## VI. Disposition

¶ 40 The judgment is affirmed.

JUDGE TOW and JUDGE MEIRINK concur.

17