21CA0181 Peo in Interest of NT 01-20-2022 COLORADO COURT OF APPEALS Court of Appeals No. 21CA0181 Adams County District Court No. 18JV423 Honorable Patrick H. Pugh, Judge The People of the State of Colorado, Appellee, In the Interest of N.T., a Child, and Concerning R.T., Appellant. JUDGMENT AFFIRMED Division IV Opinion by JUDGE FREYRE J. Jones and Tow, JJ., concur NOT PUBLISHED PURSUANT TO C.A.R. 35(e) Announced January 20, 2022 Heidi M. Miller, County Attorney, Rebecca Wiggins, Assistant City Attorney, Westminster, Colorado, for Appellee Tausha Riley, Jared McCauley, Guardians Ad Litem Just Law Group, LLC, John F. Poor, Denver, Colorado, for Appellant 
1 ¶ 1 In this dependency and neglect proceeding, R.T. (father) appeals the judgment terminating his parental rights to N.T. (the child). We affirm. I. Background ¶ 2 In December 2018, the Adams County Department of Human Services (Department) initiated an action in dependency and neglect based on concerns about mother’s substance use. The Department did not initially know father’s whereabouts, but it eventually located him in federal custody in New Jersey. After father failed to appear at an adjudicatory hearing, a magistrate entered a default judgment adjudicating the child dependent and neglected. ¶ 3 In February 2020, the Department moved to terminate father’s parental rights, asserting that he had abandoned the child. The juvenile court held a termination hearing over multiple days between October 2020 and January 2021. After hearing the evidence, the court took the matter under advisement and later entered a written order terminating father’s parental rights. ¶ 4 Father appealed the judgment, arguing, in part, that the juvenile court and the Department had not complied with the notice requirements of the Indian Child Welfare Act of 1978 (ICWA), 25 
2 U.S.C. §§ 1901-1963. We remanded the case to the juvenile court for the limited purpose of resolving the ICWA notice issues. On remand, the court concluded that ICWA does not apply. We then recertified the appeal. II. ICWA ¶ 5 Father first contends that the juvenile court and the Department failed to comply with ICWA’s notice requirements. See 25 U.S.C. § 1912(a). After reviewing the supplemental record produced following the limited remand, we disagree. ¶ 6 If the juvenile court knows or has reason to know that a child is an Indian child, the Department must directly notify any applicable tribes by registered or certified mail, with return receipts requested, of the pending child-custody proceeding. 25 C.F.R. § 23.111(a)(1), (c) (2021); § 19-1-126(1)(b), C.R.S. 2021. The Department should then file with the court a copy of the notice together with any return receipts or other proof of service. 25 C.F.R. § 23.111(a)(2). The court should not conduct a termination hearing “until at least ten days after receipt of notice” from the tribe. 25 U.S.C. § 1912(a); People in Interest of Z.C., 2019 COA 71M, ¶ 15. 
3 ¶ 7 Where a tribe does not respond to a notice sent before the Department moves to terminate parental rights, ICWA requires the Department to send an additional notice of the termination proceeding. See People in Interest of S.R.M., 153 P.3d 438, 442 (Colo. App. 2006); see also Bureau of Indian Affairs, Guidelines for Implementing the ICWA (Dec. 2016), https://perma.cc/3TCH-
8HQM (“Notice is required for a [termination] proceeding, even if notice has previously been given for the child’s foster-care proceeding.”). ¶ 8 Whether ICWA’s notice requirements are satisfied is a question of law we review de novo. People in Interest of T.M.W., 208 P.3d 272, 274 (Colo. App. 2009). ¶ 9 In this case, father completed an ICWA assessment form and declared that he had “Oglala Lakota and Cheyenne” heritage. The Department sent notices to two Cheyenne tribes (the Northern Cheyenne Tribe and the Cheyenne and Arapaho Tribes of Oklahoma) and two Sioux tribes (the Oglala Sioux Tribe and the Cheyenne River Sioux Tribe). ¶ 10 On the second day of the termination hearing in December 2020, paternal grandmother provided additional aliases for a 
4 paternal great-grandmother, and the Department said that it would send out new notices with the updated information. The court continued the termination hearing to January 2021 to allow the Department to send additional ICWA notices. At the January 2021 hearing, the Department told the juvenile court that it had sent the additional notices but had not received the return receipts yet. ¶ 11 In its written order, the court found that the Department had complied with ICWA’s notice requirements, but the court stated that it would hold the “order in abeyance until it received the amended ICWA notice and certified mail receipts.” The Department subsequently filed a copy of the amended notice, which indicated that notice had been sent to the two Sioux tribes the Department previously noticed, as well as fifteen other Sioux tribes. However, the notice did not indicate that either Cheyenne tribe had been sent the amended notice. The Department eventually filed return receipts and responses from most of the tribes. ¶ 12 We conclude, for the following reasons, that the juvenile court and Department adequately complied with the notice provisions of ICWA. 
5 ¶ 13 First, as to the seventeen Sioux tribes, the record shows that only four of them failed to respond to the amended notice. But because the record shows that those four tribes received notice more than ten days before the court entered its termination order, we discern no error. See 25 U.S.C. § 1912(a); see also People in Interest of N.D.C., 210 P.3d 494, 500 (Colo. App. 2009) (“[T]he court need not delay the termination hearing until the tribe responds; it need only wait ten days post receipt.”). ¶ 14 Second, as to the two Cheyenne tribes, even though the notice filed with the court did not list these tribes, the supplemental record contains responses to the amended notices indicating that the child is not a member or eligible for membership in either tribe. See People in Interest of A.R.Y.-M., 230 P.3d 1259, 1261 (Colo. App. 2010) (“If, after receiving all known information, a tribe responds that a child is not an Indian child, any errors in the notice are deemed to be harmless.”). In any event, on remand, the Department sent additional notices to the Cheyenne tribes, and the supplemental record indicates that the tribes received the additional notices on October 25, 2021. The Northern Cheyenne Tribe responded that the child is not a member or eligible for 
6 membership. And, while the Cheyenne and Arapahoe Tribes of Oklahoma did not respond to the additional notice, the juvenile court waited more than ten days before entering its order. See N.D.C., 210 P.3d at 500. III. Motion to Set Aside the Default Adjudication ¶ 15 Father next asserts that the juvenile court erred by failing to set aside the default adjudication. Specifically, he contends that, because he was incarcerated, the court should have appointed counsel for him before entering the default adjudication. Because father’s claim was not properly preserved for review, we decline to address it. ¶ 16 Father asserts that he preserved this issue by filing a motion to set aside the default adjudication. However, the order denying his motion to set aside default adjudication was entered by a magistrate. Before this court can review an issue presented to a magistrate, the party must petition the district court for review of the magistrate’s order. § 19-1-108(5.5), C.R.S. 2021; see People in Interest of K.L-P., 148 P.3d 402, 403 (Colo. App. 2006). But the record is clear that father never filed a petition for judicial review of the magistrate’s order. We therefore cannot address this issue for 
7 the first time on appeal. See K.L-P., 148 P.3d at 403 (if the party does not raise an issue before the district court in a petition for review, the party asks us to correct an error that the district court could have corrected). ¶ 17 To the extent that father challenges the denial of counsel at the adjudicatory phase, his challenge is untimely. See People in Interest of C.B., 2019 COA 168, ¶¶ 18, 23 (“Challenges to the propriety of a judgment of adjudication must be raised in a timely appeal from the adjudicatory stage of a dependency and neglect proceeding.”). IV. Termination of Parental Rights ¶ 18 Father also asserts that we should reverse the termination judgment because the juvenile court erred by finding that (1) he had abandoned the child under section 19-3-604(1)(a), C.R.S. 2021; and (2) there were no less drastic alternatives to termination. We disagree. A. Standard of Review ¶ 19 Where resolution of an issue requires application of the termination statute to evidentiary facts, it presents a mixed question of fact and law. People in Interest of A.M. v. T.M., 2021 CO 
8 14, ¶ 15. We review the juvenile court’s factual findings for clear error. C.R.C.P. 52. The credibility of witnesses, the sufficiency, probative effect, and weight of the evidence, and the inferences and conclusions to be drawn therefrom are all within the province of the juvenile court. People in Interest of C.A.K., 652 P.2d 603, 613 (Colo. 1982). But application of the proper legal standard to the particular facts of the case are questions of law that we review de novo. M.A.W. v. People in Interest of A.L.W., 2020 CO 11, ¶ 31. B. Abandonment ¶ 20 Father asserts that the juvenile court erred by finding that he had abandoned the child. Specifically, father contends that the court’s finding was erroneous given that he was incarcerated, mother attempted to conceal the child from him, and he took steps to assert his parental rights after his release from prison. We are not persuaded. ¶ 21 Under section 19-3-604(1)(a), the juvenile court may terminate parental rights if it finds by clear and convincing evidence that a child has been (1) adjudicated dependent or neglected and (2) abandoned by the parent. Subsection 604(1)(a)(I) provides that a parent has abandoned a child if the parent (1) surrendered physical 
9 custody of the child for a period of six months or more; and (2) during that period, did not manifest a firm intent to resume physical custody of the child or make permanent legal arrangements for the care of the child. ¶ 22 Abandonment is primarily a question of intent and may be determined by the parent’s actions and words. People in Interest of A.D., 56 P.3d 1246, 1248 (Colo. App. 2002). In determining whether a child has been abandoned, the circumstances must be viewed in light of the child’s best interests. Id. ¶ 23 The record shows the child was born in December 2011; father admitted at the termination hearing that he had not seen the child since then. Father testified that law enforcement arrested him at the hospital the day after the child’s birth and that he had remained incarcerated until January 2020. ¶ 24 According to father, mother initially sent him a few letters, along with photographs of the child. However, father said that when he sent return correspondence, mother did not respond. Father testified that the last time he received something from mother was around the child’s first birthday, or December 2012. 
10 ¶ 25 Father said that he received the dependency and neglect petition and summons in this case in March 2019, while he was incarcerated in a federal prison in New Jersey. The caseworker testified that she sent father copies of the court reports while he was incarcerated, but she said that he never reached out to her during this time. ¶ 26 The record shows that father returned to the Denver metro area after his release from federal prison in January 2020. The caseworker said that father appeared at the courthouse in February 2020, but his case was not scheduled on the day he appeared. She said that a county attorney provided father with information about the case, including the caseworker’s name and phone number. But she said that father still never contacted her. Shortly thereafter, father was reincarcerated, and he admitted that he did not contact the caseworker after he was reincarcerated. ¶ 27 Ultimately, the caseworker said that father had never contacted her during the case and that he did not have any contact with the child during the case. 
11 ¶ 28 Based on this record, we conclude, for the following reasons, that the juvenile court did not err by finding that father had abandoned the child. ¶ 29 First, the record supports the court’s finding that father had surrendered physical custody of the child for a period of six months or more. § 19-3-604(1)(a)(I). It is undisputed that father never had physical custody of the child, had not seen the child since the day after the child was born, was incarcerated for most of the child’s life, and had no relationship with the child. See A.D., 56 P.3d at 1248 (rejecting the parent’s assertion that he could not surrender physical custody because he never had physical custody). ¶ 30 Father asserts that he did not voluntarily surrender custody of the child because the child’s mother “forcibly separated” him from the child by cutting off communication. But father does not provide us with any authority for the proposition that mother’s actions can absolve him of taking steps to maintain or resume physical custody of the child to avoid termination under section 604(1)(a). Instead, “[a] parent who wishes to maintain the benefits of a parental relationship must bear the burden of parental responsibilities.” See A.D., 56 P.3dat 1249. Here, the record shows that, after mother 
12 stopped communicating with father, he simply ceased any further efforts to contact her or otherwise exercise his parental rights. ¶ 31 Second, the record supports the court’s finding that father did not manifest a firm intent to resume physical custody of the child or arrange for the child’s care. § 19-3-604(1)(a)(I). The court found, with record support, that father remained incarcerated at the time of the termination hearing and would not be able to resume physical custody of the child in the foreseeable future. Nor is there anything in the record suggesting that father made any efforts to arrange for the child’s care either before or after this case was filed. ¶ 32 Nevertheless, father argues that the juvenile court could not terminate his parental rights under the abandonment provision because the record shows that he participated in the case after his release from prison. But a parent’s participation in an involuntary termination proceeding, standing alone, is insufficient to preclude termination based on abandonment. See A.D., 56 P.3d at 1248. While the record shows that father made some minimal efforts to participate in the case, we see nothing in the record to suggest that these efforts amounted to a firm intent to resume physical custody or an attempt to arrange for the child’s care. See id. at 1248-49 
13 (noting that the father’s desire to “someday assume custody” and his agreement to the department’s placement of the child with a relative pursuant to the dependency and neglect case did not “obviate termination on the basis of abandonment”). ¶ 33 Father also asserts that he could not “willingly or knowingly” abandon the child because he was “incompetent.” Because abandonment is primarily a question of intent, we recognize that a parent’s lack of mental capacity may be sufficient to defeat a motion to terminate based on the abandonment provision. In re D.L.M., 703 P.2d 1330, 1332 (Colo. App. 1985). But father never presented such an argument to the juvenile court. See People in Interest of M.B., 2020 COA 13, ¶ 14 (noting that appellate courts do not address issues not presented to or ruled on by the juvenile court). And, on appeal, he does not develop his claim or provide any legal authority for his position. See People in Interest of D.B-J., 89 P.3d 530, 531 (Colo. App. 2004) (stating that appellate courts will not address undeveloped issues). In any event, even if father lacked mental capacity at the time of termination hearing, as he now argues, he does not assert that he lacked mental capacity during the entirety of the abandonment period. 
14 ¶ 34 We also are not persuaded by father’s assertion that the juvenile court erred by terminating his parental rights because the Department did not make reasonable efforts to facilitate communication between him and the child. The record shows that the caseworker made efforts to keep father apprised of the case while he was incarcerated and attempted to locate him after his release. But the record also reveals that, while father had the caseworker’s contact information, he never contacted her. See People in Interest of A.V., 2012 COA 210, ¶ 12 (noting that a parent’s unwillingness to participate in a case is a factor in determining whether the Department has made reasonable efforts). C. Less Drastic Alternatives ¶ 35 Finally, father contends that the juvenile court erred by finding that there were no less drastic alternatives to termination. We disagree. ¶ 36 Before terminating parental rights, the juvenile court must consider and eliminate less drastic alternatives. People in Interest of M.M., 726 P.2d 1108, 1122 (Colo. 1986); see also People in Interest of L.M., 2018 COA 57M, ¶ 24 (The consideration of a less drastic alternative is not a separate criterion but rather “is implicit in, and 
15 thus intertwined with, the statutory criteria for termination.”). In considering less drastic alternatives, courts must give primary consideration to the child’s physical, mental, and emotional conditions and needs. § 19-3-604(3). ¶ 37 A juvenile court may consider and weigh various factors in determining the viability of a less drastic alternative, including whether (1) an ongoing relationship with a parent would be beneficial or detrimental to the child, People in Interest of J.L.M., 143 P.3d 1125, 1127 (Colo. App. 2006); and (2) the alternative option provides the child with adequate permanence or meets the child’s needs, People in Interest of T.E.M., 124 P.3d 905, 910 (Colo. App. 2005). For a less drastic alternative to be viable, it must do more than “adequately” meet a child’s needs; rather, the less drastic alternative must be the “best” option for the child. A.M., ¶ 27. Therefore, if the court considers a less drastic alternative but finds instead that termination is in the child’s best interests, it must reject the less drastic alternative and order termination. Id. at ¶ 32. ¶ 38 When the juvenile court considers the availability of a less drastic alternative and still determines that the termination of parental rights would be in the child’s best interests, we are bound 
16 to affirm the court’s decision if its findings are supported by the record. People in Interest of B.H., 2021 CO 39, ¶ 80. ¶ 39 The juvenile court found that there were no less drastic alternatives available. Specifically, the court found that a permanent placement or an allocation of parental responsibilities (APR) to a relative was not in the child’s best interests based on his “age and substantial and emotional health needs, and the child’s need for a permanent and stable home.” See T.E.M., 124 P.3d at 910. The court also determined that an APR was not in the child’s best interests because an ongoing relationship with father would not be beneficial to the child. See J.L.M., 143 P.3d at 1127. Although father asserts on appeal that the juvenile court “failed to consider less drastic alternatives, such as an allocation of parental responsibilities,” the record is clear that the court specifically considered and rejected less drastic alternatives, as described above. Because father does not challenge the propriety of these findings, and because they are supported by competent evidence in the record, we cannot disturb them. See A.M., ¶¶ 48-50. ¶ 40 Nonetheless, father asserts that the juvenile court should have provided him with an opportunity to complete a treatment plan and 
17 become fit as a less drastic alternative. But that argument does not propose an alternative placement option that would resolve the dependency and neglect case. See People in Interest of A.R., 2012 COA 195M, ¶ 44 (noting that the less drastic alternative analysis involves the consideration of whether a placement alternative — such as an APR — would satisfy the child’s best interests). Instead, father’s contention is essentially a rebranding of his previous argument — that the juvenile court erred by terminating his parental rights under section 19-3-604(1)(a). We therefore reject father’s assertion for the same reasons discussed in Part IV.B. ¶ 41 Nor are we convinced by father’s assertion that the juvenile court erred by terminating his parental rights because the child was not in a permanent, adoptive home and termination therefore rendered him a “legal orphan.” At the October 2020 hearing, the caseworker testified that the child was placed with his grandparents, who initially wanted to adopt him, but the Department was “looking at alternative homes,” given some recent issues between the child and his sibling. The caseworker still believed that the grandparents could be a “potential permanent placement” for the child if the Department could not find another 
18 option. Although the court never heard additional testimony about whether the child had moved to a new placement at the January 2021 hearing, the court’s order indicates that there had been a “recent change of placement” to “other psychological kin.” ¶ 42 Because father does not direct us to any evidence in the record supporting his assertion that the child’s new placement was unwilling to adopt him, we necessarily reject his argument. ¶ 43 In any event, we conclude that the juvenile court did not err by deciding that, regardless of placement, termination was still in the child’s best interest. See A.M., ¶ 32. The juvenile court found that the child’s recent change in placement did not affect the “ultimate determination” of whether a less drastic alternative existed because the “benefit of permanency and stability particularly for this child, whether in the home with [his grandparents] or in a separate home . . . outweighs the benefit of an ongoing legal relationship with [father].” Because the court’s findings are supported by the record, we decline to disturb them. See B.H., ¶ 80. V. Conclusion ¶ 44 The judgment is affirmed. 
19 JUDGE J. JONES and JUDGE TOW concur.