24CA1208 Peo v Harris 03-19-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA1208
Adams County District Court No. 22CR1880
Honorable Jeffrey Smith, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Deon Lance Harris,

Defendant-Appellant.

---

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division III
Opinion by JUDGE MOULTRIE
Dunn and Harris, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced March 19, 2026

---

Philip J. Weiser, Attorney General, Carmen Moraleda, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Suzan Trinh Almony, Alternate Defense Counsel, Broomfield, Colorado, for
Defendant-Appellant

¶ 1    Defendant, Deon Lance Harris, appeals the judgment of conviction entered by the trial court after a bench trial in which the court found him guilty of second degree (reckless) assault and adjudicated him a habitual criminal. We reverse the judgment of conviction and remand with directions.

## I.    Background

¶ 2    In June 2022, Harris, the victim, and a friend were drinking at the friend's apartment when an incident occurred. The friend and the victim had been drinking heavily for hours before Harris arrived at the apartment. When Harris entered the apartment, he asked the victim to leave. The victim refused and told him to "F off." The friend described that the victim "started getting crazy with words" and "being really mean to [Harris]" during this interaction. Not long after, the victim went to the bathroom, and the friend said that the victim "kept talking some serious sh*t" as she made her way to the bathroom.

¶ 3    The victim had been in the bathroom for a few minutes, so Harris went to check on her. The friend described that that's when "all . . . hell broke loose." The friend went to the bathroom to see what was going on. She saw the victim lying on the ground with a

big "knot" on her head.  She also saw that Harris's hand was bleeding.

¶ 4    The victim called 911 multiple times and asked the operator for help.  She told the operator she had blood all over her; "He's going to kill me"; and "If you can't find me, then I'm going to be dead."  The operator asked the victim what happened to her that caused her to bleed to which the victim responded, "He beat the f*ck out of me."  The operator then asked the victim where the man was and the name of the man who hit her.  The victim didn't know where she was, and the operator was having difficulty locating the victim.  After getting frustrated that the operator couldn't find her, the victim hung up, but the operator called her back.  The operator asked the victim, "The male that hit you, what's his name?  Maybe I can find his apartment."  The victim identified Harris as the man who hit her (identification statement).

¶ 5    First responders transported the victim to the ER where a doctor treated her.  The ER doctor completed a form indicating that he believed the victim suffered serious bodily injury (SBI), in part because of a hematoma on her forehead.

¶ 6    The prosecution charged Harris with first degree assault.  A few weeks before the case was set to proceed to a jury trial, Harris requested a bench trial.  Defense counsel also filed a pretrial motion objecting to the prosecution introducing the statements from the victim's 911 call.  Defense counsel argued that the victim's statements in the 911 call were (1) testimonial statements that implicated the Confrontation Clause under both the United States and Colorado Constitutions and (2) inadmissible hearsay not subject to the excited utterance exception in CRE 803(2).

¶ 7    The court addressed Harris's objection during the second day of the bench trial.  The court found that the victim was unavailable and ruled that, based on the 911 operator's testimony and the recording itself, the victim was in an "excited state"; thus, the 911 call was admissible under CRE 803(2).  The court also ruled that the victim's 911 statements were nontestimonial because the purpose of her statements was to stop an emergency and obtain police intervention.

¶ 8    The court found Harris not guilty of first degree assault but guilty of the lesser included offense of second degree (reckless) assault.  Before trial, the prosecution filed a motion requesting to

3

add habitual criminal counts as a sentence enhancer. The prosecution alleged that Harris had been convicted of four prior felonies between 1999 and 2015. Defense counsel filed a motion asking the court to declare Colorado's habitual offender statute, section 18-1.3-801(2)(a)(I), C.R.S. 2025, facially unconstitutional. The court granted the prosecution's request and denied the defense's motion. Thus, after the court entered the guilty verdict, it held a separate hearing during which it received evidence regarding Harris's prior felony convictions and issued a written order adjudicating Harris a habitual criminal. The court sentenced Harris to thirty-two years in the custody of the Department of Corrections to run consecutive to a term of five years from an unrelated case.

¶ 9     Harris appeals and argues that (1) the court erred when it admitted evidence of the victim's 911 call; (2) the evidence is insufficient to support the court's SBI finding; and (3) Colorado's habitual offender statute is facially unconstitutional.

## II. Admissibility of the 911 Call

### A. Applicable Legal Principles

#### 1. CRE 803(2)

¶ 10    Hearsay statements aren't admissible unless they fall under an applicable exception like the excited utterance exception. *See* CRE 802; CRE 803(2). A proponent seeking to admit a hearsay statement as an excited utterance must demonstrate, as relevant here, that "(1) the occurrence or event was sufficiently startling to render inoperative the normal reflective thought processes of an observer," and "(2) the declarant's statement was a spontaneous reaction to the event." *People v. King*, 121 P.3d 234, 237 (Colo. App. 2005).

¶ 11    A court considers the following nonexhaustive factors in determining whether a statement was spontaneous: the lapse of time between the startling event and the out-of-court statement, whether the statement was accompanied by outward signs of excitement or emotional distress, whether the statement was made in response to an inquiry, and the words the declarant used to describe the experience. *People v. Abdulla*, 2020 COA 109M, ¶ 65.

¶ 12    Because the trial court "is in the best position to consider the effect of the startling event on the declarant," it has wide discretion in determining the admissibility of an excited utterance. *People v. Martinez,* 18 P.3d 831, 835 (Colo. App. 2000). We therefore review the court's ruling for an abuse of discretion. *Gonzales v. People,* 2020 CO 71, ¶ 25. A court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair or based on an erroneous understanding or application of the law. *People v. McFee,* 2016 COA 97, ¶ 17. We won't disturb the court's ruling if it has record support. *Martinez,* 18 P.3d at 835.

### 2.    The Confrontation Clause

¶ 13    A defendant in a criminal case has a constitutional right to confront witnesses against him. *See* U.S. Const. amends. VI, XIV; Colo. Const. art. II, § 16. The Confrontation Clause bars the admission of testimonial statements of a witness who doesn't appear at trial and wasn't previously subject to cross-examination. *Crawford v. Washington,* 541 U.S. 36, 53-54 (2004); *People v. Fry,* 92 P.3d 970, 976 (Colo. 2004) (adopting *Crawford*'s Confrontation Clause inquiry); *see also Nicholls v. People,* 2017 CO 71, ¶ 31 ("Colorado's Confrontation Clause [is] commensurate with the

federal Confrontation Clause."). However, a defendant's right of confrontation doesn't extend to nontestimonial hearsay statements that fall within a firmly rooted exception. *See Davis v. Washington*, 547 U.S. 813, 821 (2006).

¶ 14     A court determines whether a 911 call is testimonial by considering the caller's intent. *People v. Welsh*, 176 P.3d 781, 792 (Colo. App. 2007). For example, if a caller is answering a 911 operator's questions that are asked primarily to establish or prove the facts of a past crime, then those statements are testimonial. *Davis*, 547 U.S. at 826. Conversely, if a 911 caller describes current circumstances that require police or medical assistance, then those statements are nontestimonial. *Id.* at 827; *Welsh*, 176 P.3d at 792.

¶ 15     We review de novo whether the admission of evidence violated a defendant's confrontation rights. *McFee*, ¶ 28.

## B.     Analysis

¶ 16     Harris contends that the statements were inadmissible hearsay not subject to the excited utterance exception and that the court violated his Sixth Amendment right to confront the victim

when it admitted the identification statement from the 911 call. We disagree.

### 1. The Victim's Statements Were Admissible as Excited Utterances

¶ 17 Harris argues that the victim's statements weren't excited utterances because the victim was relatively calm during the 911 call and her responses to the operator's questioning indicated that she maintained a normal, operative thought process; the victim hung up on the operator, demonstrating that she didn't fear ongoing danger or an ongoing startling event; and the victim's identification statement wasn't a spontaneous reaction to the incident but was instead made in response to questioning. But, for three reasons, we conclude that the court didn't abuse its discretion in admitting into evidence the 911 call.

¶ 18 First, we reject Harris's assertion that the victim was relatively calm during the call. The victim was audibly distraught throughout the call. The victim expressed multiple times throughout the call that if the operator couldn't help her, she was "going to be dead." And, during the last minute of the call, the victim can be heard

8

screaming, "Get him out of here!" which supports that the victim continued to experience fear and distress until the end of the call.

¶ 19 Second, the circumstances of the call negate Harris's assertion that the victim's action of hanging up evidenced that she had an "independent interlude[] of reflective thought." *People v. Stephenson*, 56 P.3d 1112, 1116 (Colo. App. 2001). Mere seconds elapsed between the instances of the victim hanging up. *Contra id.* at 1115 (concluding a witness's statement wasn't spontaneous because it occurred three hours after the startling event). Each time the victim hung up, the operator either immediately called the victim back or had the victim call back, and the victim continued to express that she feared for her life.

¶ 20 Third, while it's true that the victim's identification statement was made in response to a question from the 911 operator, the question and the victim's answer were directly related to the operator's attempt to locate the victim. The victim made the identification statement shortly after she was assaulted, and the fact that she couldn't tell the operator where she was supports an inference that the victim's thought process was disrupted by the assault. *See Martinez*, 18 P.3d at 835 (an assault is a "startling

event"); *see also King*, 121 P.3d at 237-38 (the excited utterance exception applies to statements made in response to questioning so long as the circumstances demonstrate the statements were made in response to a sufficiently startling event).

¶ 21 The record demonstrates that the incident was sufficiently startling to render inoperative the victim's normal reflective thought processes, there was only a short lapse of time between the event and the victim's out-of-court statements, the victim continued to be distressed, and the statements — including the identification statement — were made in response to the incident. *See Abdulla*, ¶ 65. Accordingly, the court didn't abuse its discretion when it determined that the victim's statements were admissible as excited utterances.

2. The Identification Statement Was Nontestimonial

¶ 22 Harris concedes that, "during the early portion of the call, [the victim's] statements were nontestimonial." But he argues that the 911 operator's questions later "morphed the call into a statement to prove a past fact" — the identity of the victim's attacker. It's possible for a 911 call that begins for an emergency assistance

10

purpose to become testimonial. *Davis*, 547 U.S. at 828. However, we can't conclude that is the scenario here.

¶ 23 During the 911 call, the victim indicated that the man who had attacked her was still present. And, as already discussed, the 911 operator couldn't locate the victim as she was in the midst of this emergency. Thus, when viewed objectively, it's clear that the primary purpose of the 911 operator's questions was to resolve the emergency, rather than to learn what had already happened. *See id.* at 827.

¶ 24 Accordingly, we conclude that the victim's identification statement was nontestimonial and therefore didn't implicate Harris's confrontation rights.

### III. Sufficiency of the Evidence

### A. Additional Background

¶ 25 The court heard testimony from the ER doctor during the trial. As relevant here, the ER doctor said that a large hematoma above the victim's left eye constituted SBI. The ER doctor explained that a hematoma is a collection of blood that develops underneath the skin due to a traumatic injury.

¶ 26 The ER doctor then testified as follows:

11

[Prosecutor]: Okay. And as to the hematoma specifically[,] what is the risk of — substantial risk of serious permanent disfigurement?

[ER Doctor]: Well, with the large hematoma that she had it can — there [are] a lot of facial nerves that we have obviously and when you have a large hematoma or pressure on that it can damage the nerves and that can eventually cause *in her case* like asymmetrical forehead movement.

[Prosecutor]: Involuntary movements of her face?

[ER Doctor]: Not necessarily involuntary but inability to move, correct.

(Emphasis added.)

¶ 27 Crediting the ER doctor's testimony and opinions, the court found that the prosecution had proved beyond a reasonable doubt that the victim had suffered SBI because the hematoma created a substantial risk of serious permanent disfigurement.

### B.  Applicable Legal Principles

¶ 28 Serious bodily injury includes "bodily injury that, either at the time of the actual injury or at a later time, involves . . . a substantial risk of serious permanent disfigurement." § 18-1-901(3)(p), C.R.S. 2025.  "[T]he facts of the actual injury control the substantial risk of [serious permanent disfigurement]

12

determination under section 18-1-901(3)(p), *not* the risk generally associated with the type of conduct or injury in question." *People v. Vigil*, 2021 CO 46, ¶ 33.

¶ 29    We review sufficiency of the evidence claims de novo. *McCoy v. People*, 2019 CO 44, ¶ 63; *Maestas v. People*, 2019 CO 45, ¶ 13 ("[A] conviction that is based on legally insufficient evidence cannot stand."). When a defendant challenges the sufficiency of the evidence supporting a conviction, we consider whether the relevant evidence, viewed as a whole and in the light most favorable to the prosecution, "is substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt." *McCoy*, ¶ 63 (quoting *Clark v. People*, 232 P.3d 1287, 1291 (Colo. 2010)). We must "give the prosecution the benefit of all reasonable inferences that might fairly be drawn from the evidence," *People v. Donald*, 2020 CO 24, ¶ 19, so long as such inferences are supported by a "logical and convincing connection" between the inferred conclusion and the established facts, *id.* (quoting *People v. Perez*, 2016 CO 12, ¶ 25).

## C.    Analysis

¶ 30    Harris argues that the evidence doesn't support that the victim's facial hematoma created a substantial risk of permanent disfigurement because the victim wasn't "actually at risk of suffering from nerve damage" and wasn't diagnosed with any nerve damage.  He asserts that the ER doctor's testimony that a hematoma *can* cause damage to facial nerves only identified a risk generally associated with the type of injury the victim sustained, rather than a risk associated with the victim's actual injury.  *See Vigil*, ¶ 33.

¶ 31    The People dispute Harris's assertion that the doctor's testimony pertained to the risks generally associated with hematomas, rather than to the risks specific to the injury the victim actually suffered.  In essence, the People argue that the doctor's "in her case" statement moved the risks resulting from the victim's hematoma injury from the realm of generalized possibilities to the realm of specific inevitabilities.

¶ 32    To the extent that Harris asserts that the victim needed to have suffered facial nerve damage at the time she was hospitalized for her injury to qualify as SBI, we reject that assertion.  Section

14

18-1-901(3)(p) expressly considers a substantial risk of serious permanent disfigurement that occurs either at the time of the actual injury *or* in the future.

¶ 33   However, even affording the prosecution the benefit of any conflicting inferences from the doctor's testimony, *Perez*, ¶ 31, we conclude that the doctor's testimony was insufficient to support the court's SBI finding. This is so because nothing in the doctor's testimony supports the conclusion that the risk the victim actually suffered from the hematoma — the risk of future asymmetrical forehead movement — was likely to be permanent.

¶ 34   Although the ER doctor testified that the victim's hematoma could eventually result in the victim being unable to move portions of her forehead, nothing in the doctor's testimony indicated that such disfigurement would be *permanent. See People v. Duncan*, 2023 COA 122, ¶ 10 (discussing the meaning of the term "permanent" under section 18-1-901(3)(p)) and defining it as "continuing or enduring without fundamental or marked change," "stable," or generally "indelible" (quoting Merriam-Webster Dictionary, https://perma.cc/DSC9-FAMB)). Indeed, the doctor admitted on cross-examination that a hematoma "will evolve into a

bruise," reduce in swelling, and ultimately resolve on its own as part of the healing process. And given that the victim's future risk of asymmetrical forehead movement was linked to the pressure that the hematoma placed on her facial nerves, there is no evidence in the record to explain how the victim's injuries would be permanent regardless of the hematoma healing process. *See Perez*, ¶ 25.

¶ 35 And although the ER doctor opined that the hematoma constituted an SBI, it remained the trial court's responsibility to determine whether the evidence satisfied the legal definition of SBI, regardless of the ER doctor's uncontroverted opinion. *See Corcoran v. Sanner*, 854 P.2d 1376, 1380 (Colo. App. 1993) (a court is not bound by an expert's determination of the applicability of the law). Yet the trial court doesn't explain in its verdict — nor does the record reveal — how the victim suffered a substantial risk of serious *permanent* disfigurement based on the evidence underlying the ER doctor's ultimate opinion. Thus, even giving the prosecution the benefit of all reasonable inferences, we can't conclude that the evidence is sufficient to support Harris's conviction for second degree assault beyond a reasonable doubt. *See McCoy*, ¶ 63.

¶ 36    The trial court explicitly based its SBI findings on the doctor's testimony about the victim's hematoma.  Nonetheless, the People contend that we can — and should — affirm the court's SBI finding on alternate grounds.  Specifically, the People argue that there was sufficient evidence to establish SBI based on the ER doctor's testimony that the victim experienced symptoms consistent with having sustained a concussion.  But whether an injury qualifies as an SBI is a factual determination.  *People v. Baker*, 178 P.3d 1225, 1233 (Colo. App. 2007).  And we can't make factual findings. *Carousel Farms Metro. Dist. v. Woodcrest Homes, Inc.*, 2019 CO 51, ¶ 19, ("[A]ppellate tribunals don't (and, indeed, can't) make findings of fact.").

¶ 37    Harris doesn't challenge the sufficiency of the evidence supporting the court's remaining elemental findings.  And because we've determined the evidence wasn't sufficient to support the court's SBI finding, the People request remand for entry of judgment of conviction and resentencing on the lesser included offense of third degree assault.  *See People v. Rigsby*, 2020 CO 74, ¶ 34 (third degree assault is a lesser included offense of second degree assault); *People v. Thompson*, 529 P.2d 1314, 1316 (Colo.

17

1975) (third degree assault is a lesser included offense of second degree assault where the only difference between the greater and the lesser offense is the degree of injury). Harris concedes that this is the appropriate remedy, and we agree.

¶ 38 Accordingly, we reverse the judgment of conviction for second degree assault, and we remand the case to the trial court with directions to enter a judgment of conviction for third degree assault and to resentence Harris on that conviction.

## IV. Harris's Challenge to the Constitutionality of Colorado's Habitual Offender Statute

¶ 39 Because we conclude that the trial court must reverse Harris's second degree assault conviction and resentence him on remand for the third degree assault conviction — a class 1 misdemeanor — we don't address Harris's constitutional challenge to the habitual offender statute, which is only implicated when the offense for which a defendant is convicted is a felony. *See* § 18-1.3-801(2)(a)(I); *Thomas v. People*, 2021 CO 84, ¶ 60; *see also Mulberger v. People*, 2016 CO 10, ¶ 23 (Gabriel, J., concurring in the judgment) (noting that the "cardinal principle of judicial restraint" is deciding no more than is necessary (quoting *PDK Lab'ies Inc. v. U.S. Drug Enf't*

*Admin.*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment))).

## V.    Disposition

¶ 40    The judgment of conviction for second degree assault is reversed.  The case is remanded to the trial court to enter a judgment of conviction for third degree assault and to resentence Harris on that conviction.

JUDGE DUNN and JUDGE HARRIS concur.